[S. F. No. 23967. Aug. 17, 1979.]

LAWRENCE E. FUREY, as Trustee, etc., Plaintiff and Appellant, v. CITY OF SACRAMENTO et al., Defendants and Respondents.

ERNEST E. WEBBER et al., Plaintiffs and Appellants, v. CITY OF SACRAMENTO et al., Defendants and Respondents.

## Counsel

Thelen, Marrin, Johnson & Bridges, Douglas B. Hughmanick, Richard M. Sims III, Desmond, Miller, Desmond & Bartholomew, Stephen James Wagner and Richard F. Desmond for Plaintiffs and Appellants.

James P. Jackson, City Attorney, Leliand J. Savage, Deputy City Attorney, Barrett, Newlan & Matheny and Ronald R. Haven for Defendants and Respondents.

Evelle J. Younger, Attorney General, E. Clement Shute, Jr., R. H. Connett, Assistant Attorneys General, and Mark I. Weinberger, Deputy Attorney General, as Amici Curiae on behalf of Defendants and Respondents.

## Opinion

MANUEL, J.—In these two cases, which have been consolidated for purposes of appeal, we face the question, among others. whether a city,

having participated with other public entities in the creation of a special sewer assessment district in a county area intended for transition to urban development, and later having annexed the area, may thereafter amend its general plan and enact an open space ordinance in a manner precluding certain of the owners of property subject to assessment from realizing all or substantially all benefits from the underlying public improvement for an indefinite period of time. We conclude that in the circumstances here alleged it may not, and that in the absence of appropriate reassessment or other relief being afforded, the amendment and ordinance may not be applied to such owners and their properties.

## I

Plaintiffs appeal from judgments of dismissal entered following the sustaining of demurrers, without leave to amend, to their complaints seeking damages for inverse condemnation, declaratory and injunctive relief, and mandate. In the following statement of the facts we accept all properly pleaded allegations of the complaints as true for purposes of this appeal. (See, e.g., *Serrano* v. *Priest* (1971) 5 Cal.3d 584, 591 [96 Cal.Rptr. 601, 487 P.2d 1241].)

The so-called Natomas area of Sacramento County (County) is an area of approximately 15 square miles, devoted primarily to agricultural uses, which is located to the north of the metropolitan area of the City of Sacramento (City). Since 1960, Lawrence E. Furey and his predecessor Joseph A. Maun, trustees, (Furey) have held title to approximately 1,157 acres of land in the portion of this area presently lying to the north of Interstate 880. Ernest E. Webber, Nellys F. Webber, and Robert E. Waller (Webber) have owned approximately 363 acres in the same portion of the Natomas area for a similar length of time. Beginning in 1961, and in light of government determinations on various levels contemplating the imminent and continuing transition of the entire Natomas area to urban development and uses, County, upon a finding of public interest and convenience, undertook the establishment of a special sewer assessment district therein under the provisions of the Improvement Act of 1911 (Sts. & Hy. Code, § 5000 et seq.), which district was to undertake all measures necessary to install various trunk sewer lines and a sewer treatment facility in the area. Said improvements were designed to provide adequate sewer disposal facilities for the anticipated residential and commercial use of over 4,000 acres of planned residential development, including homes, shopping centers and schools. City, within whose then boundaries some of the contemplated improvements

and benefits were to be installed, gave its formal consent, and on October 7, 1961, the Natomas area was annexed to City. In January 1962, by action of the board of supervisors of County, defendant Natomas Sanitation District of Sacramento County (District)[1] was formed as a "county sanitation district" pursuant to the provisions of section 4700 et seq. of the Health and Safety Code and since that time has exercised the powers granted to such a district by the provisions of section 4738 et seq. of the same code; on the same date said district assumed ownership, control, management and supervision of the sewer facilities to be built.[2]

Work on the contemplated improvements was commenced in 1961 and completed in 1965. During this same general period of time City and County adopted other plans and entered into other agreements reflecting and specifying the intended urban and commercial development of the Natomas area, including the Natomas General Development Plan (1962), the Sacramento Metropolitan Airport Plan (1962), various freeway agreements with planned interchanges for the servicing of urban uses, a Northgate Gardenland community plan (1965), and an Old City community plan (1966).

In April 1965, the assessment on the project was confirmed. The total assessment was $3,137,462; of this $840,644.72 was allocated to the Furey property and $378,609 to the Webber property. Pursuant to the provisions of the Improvement Act of 1911 bonds were issued by County and plaintiffs thereupon became obligated to make and presently continue to make annual payments of principal and semi-annual payments of interest against the amounts allocated to their respective properties.[3]

In 1970 the Legislature enacted comprehensive legislation directed to the preservation of open-space lands within the state. (Gov. Code, § 65560 et seq.) As amended Government Code section 65563 required

---

[1]In the Webber action the district is referred to as the Natomas Sewer Assessment District rather than the Natomas Sanitation District of Sacramento County. It was indicated at oral argument that these two districts are one and the same.

[2]In October 1974, defendant Sacramento Regional County Sanitation District assumed partial ownership, management and control of the subject sewer facilities and also agreed to assume all prior and subsequent liabilities of District. For convenience, hereafter both districts will be referred to collectively.

[3]It is alleged in the Furey complaint that the Fureys have paid over $502,000 in principal and $324,000 in interest (or a total of approximately $826,000) on their bonded obligation. The Webber complaint does not allege the amount paid by them to the date of filing. In their answer to the petition for hearing before this court the Webbers state that a total of over $350,000 has presently been paid.

that every city and county (apparently including charter cities such as Sacramento—see Gov. Code, §§ 65700, 65302, subd. (e)) by December 31, 1973, adopt a local open-space plan "for the comprehensive and long-range preservation and conservation of open-space land within its jurisdiction," and that an interim plan be adopted by August 31, 1972. Thereupon defendants City, County, and District met on numerous occasions for the purpose of complying with these requirements. These meetings were carried on with full knowledge of (1) the various existing plans affecting the Natomas area and contemplating its transition to urban use, and (2) the construction and assessment which had previously been carried on by District. Nevertheless it was determined that the Natomas area be included in the open-space plan. In 1972 City imposed a moratorium on building and development in the area, and on or about July 7, 1973, it adopted an "Open Space Element" to its general plan indicating that that portion of the Natomas area lying to the north of Interstate 880 was to be reserved for agricultural and open-space uses. This element provided: "Lands that are recommended for retention in the Open Space Plan as an agricultural preserve are located in the Natomas area north of Interstate 880. Of the total 6,934 acres within the City in this area, the 3,582 acres north of Del Paso Road are recommended for a permanent agricultural designation while the approximately 3,172 acres of agricultural land south of Del Paso Road are recommended for an agriculture-urban reserve designation. Lands designated for permanent agriculture are not anticipated, at the present rate of urban growth locally, to be required for urban land uses within the time span of the City's General Plan; while lands designated for agriculture-urban reserve could be needed in part or wholly for contiguous urban growth outward from the City core within the next twenty year period."

The Open Space Element also contained recommendations to "[r]eview City agriculture-urban reserve areas at the time of General Plan updating every 5 to 7 years and adjust these areas if contiguous urban growth warrants the change" and to "[r]eview permanent agriculture areas every 20 years and adjust these areas if warranted."

All of the lands here in question are within the agricultural reserve thus created. Approximately four-fifths of the Furey property lies within the "permanent agriculture" area; the remainder of the Furey property and all of the Webber property lies within the "agricultural-urban reserve" area.

On the date of its adoption of the Open Space Element of its general plan City also amended its comprehensive zoning ordinance, setting up certain open-space zones including one designated "Agricultural Zone —A" and one designated "Agricultural Open Space—A-OS." Only the following special uses were to be allowed in these open-space zones, subject to the granting of a special permit by the planning commission: "a. Accessory dwellings for persons employed for agricultural purposes on the subject property. b. Animal kennels and hospitals. c. Animal or poultry slaughtering or processing facilities. d. Outdoor amusement enterprises. e. Livestock feed or sales yards. f. Stands for sale of agricultural products. g. Mineral extraction operations. h. Riding stables. i. Golf courses or driving ranges. j. Public utilities or facilities." The ordinance also provided: "No special permit shall be issued hereunder unless the Planning Commission first determines that such issuance would be in conformity with the Zoning Ordinance and the General Plan as they relate to open space." It also stated: "D. Variances: Open space regulations are to be literally and strictly interpreted and enforced to protect the public interest in the preservation and conservation of open space lands and their amenities and the orderly urban development of such lands as required; hence, variances will be granted only in extreme circumstances."

Shortly after the amendment of the general plan and the zoning ordinance Webber attempted to file with City's planning commission a tentative subdivision map, an application to rezone, and an application to amend the general plan. When the planning commission refused to accept all of these but the latter, and when subsequent attempts to obtain a hearing before the planning commission and the city council proved unsuccessful, the Webber action was filed. Furey apparently made no attempt to pursue these administrative remedies, but in May 1974, submitted written requests to City and County that a reassessment of the costs of the subject improvements be undertaken, that all amounts paid under the assessment be refunded, and that all future payments be paid out of public funds, all pursuant to the provisions of the Improvement Act of 1911, specifically sections 5550 through 5565 of the Streets and Highways Code. No action was taken by defendants pursuant to these requests.

The lands here in question continue to be zoned agricultural and are used for agricultural purposes as they have at all times in the past.[4] It is

---

[4]Defendants permitted Webber to develop a certain portion of the affected property as a mobile home park in 1970. This portion of the property, which presently utilizes the subject sewage facilities, is apparently not involved in this litigation.

alleged that defendants intend that such property shall forever be restricted to such uses, and that so long as the use of the property is so restricted the sewer improvements and facilities in question will be of no benefit to plaintiffs. The sewer improvements and facilities, including the various trunk sewer lines and the sewage treatment plant, are currently operational and in use to transport and treat sewer effluent produced by other citizens of defendants City and County.[5] None of the sewage thus transported and treated is produced on the subject property. It is alleged that such transportation and treatment of sewage is for the benefit of the general public of defendants City and County.

In October 1974, Furey filed an action in the United States District Court for the Eastern District of California seeking damages for inverse condemnation, refund of sewer assessments, and declaratory relief. Defendants' subsequent motion to abstain from the exercise of federal jurisdiction was granted, however, and the court stayed further action pending a final determination of state issues in the state courts, reserving jurisdiction to determine any issues of federal constitutional law if necessary.

## II

The Furey complaint sets forth five causes of action. The first seeks damages for inverse condemnation based upon the difference between the value of the Furey property if used for residential or commercial purposes and its value if restricted to agricultural uses; alternatively it is alleged that defendants are estopped from denying plaintiff the right to use the subject property for residential or commercial purposes. The second, third, and fourth seek recovery of amounts paid or to be paid as principal and interest on the bonds issued to finance the subject improvements; again, theories of inverse condemnation and estoppel are relied upon, but it is also urged that unlawful assessment out of proportion to benefits accruing to assessed property has occurred. The fifth cause of action seeks a declaration that the open-space plan and zoning ordinance are void and unlawful and an injunction against actions preventing residential and commercial development.

---

[5]The Sacramento Area Regional Planning Commission's 1974 Water and Waste Management Plan and Program, of which we take judicial notice (Evid. Code, § 452, subd. (b)), states at page 34 that in 1974 the Natomas Treatment Facility was processing 900,000 gallons of waste water per day.

The Webber complaint sets forth nine causes of action. The first and fifth seek damages for inverse condemnation measured by the diminution in value of the Webber property and the amounts paid or to be paid under the sewer assessments. The second and third also seek damages, the second for breach of contract and the third on a theory of unjust enrichment in the amount of past and future sewer assessments. The fourth alleges estoppel from denying plaintiff the right to use his property for urban purposes. The sixth and seventh causes of action seek a writ of mandate requiring rezoning and an amendment of the general plan. The eighth cause of action, directed against defendants County and District only, seeks a rebate of past payments and an injunction against further collection of payments pursuant to the sewer assessment. The ninth seeks declaratory relief relative to plaintiff's future liability for payments under the assessment and entitlement to recovery of past payments.

The trial court, consolidating the cases for hearing on demurrers only, sustained defendants' demurrers to all causes of action in each case and entered judgments of dismissal. Plaintiffs appeal.

### III

■ We are satisfied that the adoption of the open-space element of City's general plan, together with the strong wording of the amended zoning ordinance, essentially foreclosed all administrative discretion relative to the use of plaintiffs' property for any purpose other than those permitted under the agricultural open-space legislation. Webber's unsuccessful efforts to obtain administrative relief underscore this fact. Furey, by unsuccessfully requesting reassessment pursuant to the provisions of Streets and Highways Code section 5550 et seq., exhausted that avenue of approach. Accordingly, we conclude that all available administrative remedies were exhausted by plaintiffs prior to seeking judicial relief.

### IV

■ Plaintiffs urge that they are entitled to damages for inverse condemnation owing to diminution in the value of their lands resulting from limitations upon its use imposed by City's amendment of its general plan and zoning ordinance. As we pointed out in the recent case of *Agins v. City of Tiburon* (1979) *ante,* page 266 [157 Cal.Rptr. 372, 598 P.2d 25], however, such relief is not available for these purposes. Rather the aggrieved landowner is limited to showing, through an action for declaratory relief or mandate, that the legislation or regulation in

question, viewed either on its face or as applied, is an invalid exercise of the police power in violation of the Fifth Amendment to the United States Constitution and article I, section 19, of the California Constitution. This, we held, may be shown only by demonstrating that the effect of the regulation "is to deprive the landowner of substantially all reasonable use of his property." (*Id.,* at p. 277.) Plaintiffs have not alleged any such effect in the instant case. Rather they have alleged that their lands, which have for many years been used for agricultural purposes, must continue to be so used in the future as a result of City's actions. It cannot be said that agricultural use of lands long devoted to that purpose is other than a reasonable use. Accordingly plaintiffs have failed to allege facts entitling them to relief by way of declaratory relief or mandate on this basis.

It is clear from the foregoing that plaintiffs have not stated facts which, if shown to be true, would entitle them to relief by way of inverse condemnation or mandate on account of *diminution in the value of their lands*[6] which is alleged to have been brought about by City's amendment of its general plan and zoning ordinance. This is not to say, however, that they are entitled to no relief whatsoever in the circumstances here presented, for the instant case involves an aspect which goes beyond the matter of mere diminution in the value of land due to reasonable regulation. If the facts herein are demonstrated at trial to be as alleged in the complaints, we are faced with a situation in which local government bodies, pursuing with commendable zeal the philosophy and purposes of one decade, have set into motion the machinery of public improvement in such a manner as to involve a relatively small number of property owners in the total financing thereof, only to reverse their field in the following decade and, pursuing with equal zeal the perhaps more enlightened philosophy and purposes of that later time, remove from some of those owners the ability to effectively utilize the improvement so created. Although as we have pointed out the need for government flexibility to meet the needs and requirements of each emerging generation precludes fulfilling, in all but the most extreme cases, the expectations of value brought about by earlier official moods and actions,

---

[6]Nor do we believe that there is any merit to plaintiffs' strenuous arguments by which they, drawing an analogy to certain land access cases (e.g., *Jones* v. *People* ex rel. *Dept. of Transportation* (1978) 22 Cal.3d 144, 151 [148 Cal.Rptr. 640, 583 P.2d 165]), urge that they are entitled to damages for inverse condemnation of their asserted right of access to the improvements in question. Even if we assume, for purposes of argument, that such an analogy is sound, the fact remains that plaintiffs *have* access to the subject improvements. Their true complaint is that they have not been permitted to utilize their lands in a manner which would allow them to make the maximum use of that access.

we think that entirely different considerations must govern when those moods and actions have operated to bring about substantial financial commitment on the part of taxpayers included in a special assessment district who are precluded by later governmental action from realizing substantially all special benefits generated by the district.

The Improvement Act of 1911 makes explicit provision for situations of this general character, in which events or determinations occurring subsequent to the original assessment operate to render it unjust. Chapter 20 of part 3 of the act (Sts. & Hy. Code, § 5550 et seq.),[7] entitled "Reassessments to Relieve Owners," provides in its initial section that the legislative body of a city or county (see § 5006) has the power "at any time before the assessments levied under this division are fully paid and discharged to order a reassessment under the terms and conditions set forth in this chapter." (§ 5550.) The following two sections of the chapter describe two specific situations in which this power may be exercised, namely when an improvement previously the subject of special assessment is found to provide general rather than special benefits (§ 5551) and when such an improvement has been sold as surplus property (§ 5551.5); it is not suggested, however, that these are to be the only situations in which a reassessment may be ordered. It is further provided that any such reassessment "need not be in any prescribed form but shall refer to the original assessment filed . . . and shall be accompanied by a diagram showing the lots to be reassessed and their relation to the work." (§ 5553.) Provision is also made for published notice (§§ 5554, 5555) and a hearing at which "the legislative body shall consider all objections to the reassessment and may correct inequalities or mistakes therein." (§ 5556.) Following confirmation of the reassessment it is to be recorded with the diagram, the street superintendent to "note opposite the several assessments in the original assessment that have been displaced by the reassessment the fact that the reassessment has been made . . . [and to] credit upon such reassessments all payments theretofore made upon the original assessment or upon the bonds issued to represent the original assessment." (§ 5557.)

After providing for collection, payment, and enforcement (§ 5558) and the protection of outstanding bonds (§ 5559), the chapter goes on to consider the matter of refund. Section 5560 provides in relevant part: "Whenever prior to the confirmation of the reassessment any principal payments have been made on any assessment, or on any bond issue to

---

[7]Hereafter, unless otherwise noted, all section references are to the Streets and Highways Code.

represent any such assessment, the owner of record of the property against which such assessment was levied . . . shall be entitled to receive a refund of an amount of the difference between the original assessment and the reassessment in the proportion that such payments made by him bears to the original assessment, with respect to the lot or parcel of land for which such payments were made. The balance of any such appropriation, as determined by the reassessment, shall be credited pro rata to the bonds in payment thereof, applying such payment first to the interest due and then upon the principal. Thereafter the treasurer shall pay to the holder of each bond the payment so credited from the bond and assessment redemption fund. The treasurer is hereby authorized and directed to make all payments of refunds as authorized by this chapter." In subsequent sections provision is made for notice of refund (§ 5561), the filing of claims for refund (§ 5562), the limitation of actions to contest the validity of the reassessment (§ 5563), and meeting any reassessment costs (§ 5564). Finally, in section 5565, it is stated that "[t]he making of any reassessment pursuant to this chapter in any proceedings shall not constitute a bar or limit the right to make further reassessments as the legislative body may determine."

Defendants quite properly point out, however, that sections 5550, 5551, and 5551.5 speak in permissive terms, the latter two sections indicating that the legislative body "may, in its discretion" order reassessment to relieve owners. It also appears that City and County, by failing to act upon the Furey request that such a reassessment be undertaken, have essentially exercised their discretion in the matter by refusing relief. It has been held that a writ of mandate to compel reassessment will not lie in such circumstances. (*Gordon* v. *City of Los Angeles* (1944) 63 Cal.App.2d 812, 816 [147 P.2d 961].)

■ We made it clear in the *Agins* case, however, that a land-use regulation may not be applied to one otherwise subject to it if to do so would result in a taking of property without just compensation. ■ And as the United States Supreme Court said in *Norwood* v. *Baker* (1898) 172 U.S. 269 at page 279 [43 L.Ed. 443 at p. 447, 19 S.Ct. 187], "the exaction from the owner of private property of the cost of a public improvement in substantial excess of the special benefits accruing to him is, *to the extent of such excess,* a taking under the guise of taxation of private property for public use without compensation." (See also *Spring Street Co.* v. *City of Los Angeles* (1915) 170 Cal. 24, 30 [148 P. 217]; *Harrison* v. *Board of Supervisors* (1975) 44 Cal.App.3d 852 [118 Cal.Rptr. 828].) Although it is true that in most cases the determination of

special benefit is made at the time of the confirmation and spreading of the assessment (see, e.g., *Dawson* v. *Town of Los Altos Hills* (1976) 16 Cal.3d 676, 688-689 [129 Cal.Rptr. 97, 547 P.2d 1377]), we believe that in circumstances such as those here alleged, wherein both the undertaking of the public improvement and the action foreclosing any realistic access to the special benefits generated by it have resulted from government initiative,[8] a present reexamination of the relationship between assessment and benefit is constitutionally required.

The cases of *Reichelderfer* v. *Quinn* (1932) 287 U.S. 315 [77 L.Ed. 331, 53 S.Ct. 177, 83 A.L.R. 1429] and *Ritzman* v. *City of Los Angeles* (1940) 38 Cal.App.2d 470 [101 Cal.Rptr. 541], which are heavily relied upon by defendants, do not in our view support the contrary position urged by them. In those cases landowners who had been included in special assessment districts created for the purchase and maintenance of public parklands adjoining their land sought to enjoin the construction of improvements thereon which were alleged to be inconsistent with recreational uses. It was held that the special benefits accruing by virtue of the assessment did not include the right to insist against the government that the lands be forever used as a park rather than for some other purpose consistent with the public interest. (*Reichelderfer, supra,* at p. 321 [77 L.Ed. at p. 335]; *Ritzman, supra,* at p. 476.)

We quite agree with this conclusion. We are not here concerned, however, with a case in which one subject to a special assessment seeks to prevent a governmental entity from utilizing the subject improvements for some public purpose other than that contemplated at the time of the original assessment. The improvements here in question are currently operational for the very purpose for which they were designed and built, i.e., the transportation and treatment of sewage effluent. Many other properties within (if not without) the assessment district are presently enjoying their benefits. (See fn. 5, *ante,* and accompanying text.) And yet plaintiffs, who taken together were allocated substantially more than one-third of the total assessment (or an aggregate *principal* amount of well over $1.2 million), are to be wholly deprived of those benefits by the

---

[8]To be distinguished in this respect are cases in which the construction of public improvements is undertaken on the initiative of the property owner himself. (See, e.g., Wat. Code, §§ 30200 et seq., 34150 et seq.) In such a situation, barring strong evidence of governmental inducement or promotion, the property owner stands in the position of a volunteer who, in the event of intervening regulation barring use of the improvement in the public interest, cannot be heard to complain of the loss of his investment. (See and cf. *Avco Community Developers, Inc.* v. *South Coast Regional Com.* (1976) 17 Cal.3d 785, 789-790 [132 Cal.Rptr. 386, 553 P.2d 546].)

operation of the land-use regulations here in question—and this is to occur without their ever having entered into the actual enjoyment of any of these benefits.

The aforementioned *Reichelderfer* and *Ritzman* cases are clearly distinguishable on this latter basis as well. There was no showing in those cases that the effect of the projects was to prospectively deprive the landowners of all or substantially all of the benefit underlying the assessments paid by them. It appears that the parks in question had been in existence for some time prior to the governmental action complained of—and thus had provided full benefits for a substantial period of time—and additionally there was no indication that the effect of the projects would be to substantially extinguish all recreational uses in those portions of the park remaining after their completion. Here, on the other hand, it is alleged that the effect of the governmental action in question is to remove for an indefinite time, if not forever, the possibility of deriving any significant benefit whatsoever from the subject improvement. Although it must be conceded that plaintiffs enjoyed benefits of a theoretical nature due to the availability to them of the sewer facilities prior to the passage of the open-space limitations—which benefits might properly be considered in any future reassessment—the alleged effect of those limitations in removing all practical special benefit must, in the circumstances of this case, be held to give rise to a right to appropriate relief.

■ It is further urged, however, that plaintiffs are foreclosed from judicial relief by their failure to mount a timely challenge to the original assessment. In this respect defendants place their primary reliance on the terms of section 5660, which provides in substance that no action to set aside or correct or enjoin the collection of any assessment may be maintained after the expiration of 30 days after recording thereof. We do not believe, however, that this provision and others like it may be raised as a bar against plaintiffs in the circumstances of this case.

A similar situation arose in the case of *Smoke Rise, Inc.* v. *Washington Suburban San. Com'n.* (D.Md. 1975) 400 F.Supp. 1369. There certain real estate developers sought to challenge the constitutional and statutory validity of various sewer hookup moratoria. It was held that the moratoria, which resulted from an order of the state department of health, were constitutional in all respects but that the developers, who were subject to a front foot benefit assessment for the construction of sewer lines and facilities, were deprived of due process by a requirement that any application for exemption from the assessment be made

contemporaneously with the notice of assessment. "In the view of this Court," it was held, "it is inconsistent with basic notions of fair play and due process to say that a person whose property was assessed . . . in 1968 cannot apply for and receive in 1972 an exemption from the front foot benefit charge as a result of the Secretary's 1970 moratoria orders, which orders could not reasonably have been anticipated in 1968." (400 F.Supp. at p. 1394.)

Here, as in *Smoke Rise,* plaintiffs had little reason to complain of the subject assessment when it was spread. At that time all applicable governmental planning contemplated the transition of their properties, along with all other properties in the area, to urban uses in which the special benefits contemplated by the improvement and assessment would be fully capable of realization by them. Nor do we believe that plaintiffs' failure to develop their properties in the years intervening between the improvement and assessment and City's passage of its open-space limitation should be held to bar present complaint by them. The Furey property was held in trust at all relevant times, and the complaint contains allegations to the effect that sound business decisions based upon housing demand and other relevant factors precluded development by the trustee at any time prior to City's action. Webber, although not subject to trust restrictions, allegedly proceeded in light of the same business realities, and we find no basis for distinction from Furey in this respect. In short, we conclude that the judicial challenge here mounted must be considered timely in all respects.

■ It remains to consider the remedy which is appropriate in the circumstances. As we have indicated above, plaintiffs have failed to allege facts which would entitle them to damages by way of inverse condemnation—either by virtue of diminution in the value of their lands as a result of City's open-space regulations or for the limitation of their asserted right of access to the improvements in question. (See fn. 6, *ante,* and accompanying text.) We have also explained that they are not entitled to relief from the offending regulation by way of declaratory relief or mandate due to limitations imposed thereby on the uses to which they may put their lands. We have concluded, however, that if the facts are shown to be as alleged they should be entitled to the latter form of relief on other grounds—i.e., the effect of those same regulations upon plaintiffs' ability to realize the special benefits generated by the assessment district in which they have been included and to which they have substantially contributed. We hold, therefore, that if the allegations made in the complaints before us are demonstrated at trial, relief would lie by way of

declaratory relief or mandate precluding the application of the subject land-use regulations to plaintiffs. We also believe, however, that prior to the issuance of any judgment the trial court should afford defendants a reasonable opportunity to make use of the reassessment procedures to which we have adverted above (see text accompanying and following fn. 7, *ante*) or to take other appropriate action directed toward ameliorating in equitable fashion the gross inequities which here appear.[9] Any such action should be taken into account by the trial court in its final determination.

The judgments are, and each of them is, reversed and the causes are remanded to the trial court for further proceedings in light of this opinion.

Bird, C. J., Tobriner, J., Mosk, J., Clark, J., Richardson, J., and Newman, J., concurred.

---

[9]Any such reassessment, of course, would be without prejudice to further reassessment in light of future changes in planning policy having the effect of permitting plaintiffs and others similarly situated to derive practical benefit from the subject improvements. (See § 5565.)