[Civ. No. 46704. First Dist., Div. Three. Aug. 25, 1983.]

DATELINE BUILDERS, INC., Plaintiff and Appellant, v.
CITY OF SANTA ROSA et al., Defendants and Respondents.

**COUNSEL**

Robert E. Hunter and Steven H. Bovarnick for Plaintiff and Appellant.

Bruce Leavitt and Rene Auguste Chouteau, City Attorneys, for Defendants and Respondents.

OPINION

**WHITE, P. J.**—On this appeal by Dateline Builders, Inc. (Builders) from a judgment[i] in favor of the City of Santa Rosa (City), the major question is whether the City was required to connect its existing sewer trunk line to Builders' proposed "leap frog" housing development beyond the City's boundaries. For the reasons set forth below we have concluded[2] that the City reasonably exercised its police power because Builders' proposed housing development was not consistent with the City's compact land use and development policy as set forth in the City and County's previously adopted general plan.

The pertinent facts substantially as found below and revealed by the record are as follows: Builders, a California corporation, held an option on a parcel of real property located beyond the limits of the city boundary, on Todd Road in an undeveloped rural area known as the Santa Rosa Plain. The City is a charter city located in Sonoma County (County).

The County board of supervisors determined that: (1) there was a need for development of sewer facilities in the Santa Rosa Plain; (2) it was in the public interest to avoid the proliferation of small and scattered un-unified sewer treatment facilities by a cooperative effort with the City to create a single regional facility to be owned and operated by the City. On October 17, 1964 the City and County entered into the "Plains Agreement," a mutual expression of policy and intent to exercise their police powers cooperatively for the orderly development of the Santa Rosa Plain, and to prevent a proliferation of fragment sewer districts and systems.

Paragraph 10 of the Plains Agreement provided that both the City and County would adopt a policy that the areas in the Santa Rosa Plain[3] adaptable to urban type development, would be developed consistent with the City and County's general plan[4] and with the development standards of the City. To implement this policy the City and County agreed to enact subdivision, building, zoning and other property development regulations "to prevent haphazard or substandard property development." Paragraph 10

---

[1]Builders' complaints seeking declaratory relief and a writ of mandate were consolidated for trial with its subsequent and first amended complaints for damages for breach of contract, and breach of mandatory duty. All parties other than Builders and the City have been dismissed.

[2]After oral argument we granted a rehearing and asked the parties to respond to specific questions, which we are now satisfied we need not reach.

[3]The general plan was a basic land use policy then adopted pursuant to former Government Code section 65300, discussed in greater detail below at footnote 10 on pages 529, 530.

[4]The general plan covered the 120 square mile area of the City's potential expansion.

further provided that any development proposal in the Santa Rosa Plain be accompanied by proof that the proposed development was consistent with the City and County's joint general plan and consistent with the City's development standards and regulations.

To implement one of the policies of the Plains Agreement the City Council adopted a procedure that required the proponent of a development to apply for and receive a certificate of compliance (certificate) prior to the extension of new service outside the City; the certificate then served as proof of compliance with the City's development standards.

The general plan adopted by the City and County in 1967 had as its goals, inter alia: (1) to encourage a compact growth pattern and discourage inefficient sprawl throughout the planning area; (2) to provide safe convenient traffic ways linking living areas with shopping and employment centers and recreation areas; (3) to further develop the public utility system in a manner to serve the growing metropolitan area most economically and efficiently; (4) to schedule utility extensions in a manner to help insure compact, efficient growth patterns with maximum economy; and (5) to encourage cooperation between all governmental agencies responsible for development occurring in the planning area. The Plan envisioned that utilities will be extended when it is economically feasible and "in accordance with *orderly development instead of urban sprawl.*" (Italics added.)

Builders wanted to subdivide and develop its Todd Road property as a single family moderate and low income home tract. The Todd Road property was not contiguous with the City but was contiguous to one of the City's trunk sewer lines. Builders had obtained FHA approval for the project under a loan program for homes in communities of less than 10,000 population. The sewer hookup was not a condition for the availability of the federal funds. Builders planned to build 66 single family homes and submitted a tentative subdivision map to the County in 1971. At that time, the Todd Road property was zoned for agricultural use. On December 16, 1971, the County conditionally approved the tentative map but attached 24 conditions, including sewer hookup approval from the City and rezoning[5] of the property to R-1 residential use by the County. For a project of the size contemplated by Builders, the County required a sewer system rather than septic tanks. After that date, Builders never performed any of these conditions or took any steps to do so.

---

[5]The rezoning for single family residential use was contemplated by the general plan and the property was eligible for rezoning. However, the City had no jurisdiction over zoning and could not override the County planning commission.

Builders' application for a certificate was reviewed by the City for consistency with its plan, and development policies and standards. The City determined that Builders' proposed development in an agricultural area well beyond the City boundaries represented "leap-frog" development inconsistent with the City's plans, policies and standards.[6] On December 9, 1971, the City denied the request without prejudice; Builders never submitted a subsequent or renewed application for a certificate. Builders appealed the determination to the City Council. On January 4, 1972, the City Council heard the appeal and refused to issue the certificate, on the same grounds, i.e., inconsistent with the City's general plan and standards for compact development.

On March 2, 1972, the City Council reiterated its refusal and explained that the Builders' proposed development was in conflict with the 1967 General Plan of compact growth. The staging concept would provide utility services to undeveloped and partially developed areas immediately surrounding the urban core before such services would be available to areas more removed from the urban core. The City's lack of sewer capacity was not a reason for the City's denial of the certificate. No environmental review pursuant to the state's Environmental Quality Act was prepared for the proposed development. The County's tentative approval of Builders' subdivision map expired on June 16, 1973, by operation of law. Builders commenced the instant action in May 1972.

The trial court concluded that: (1) Builders was neither a third party beneficiary of, nor entitled to, enforce the Plains Agreement; and (2) the City was not liable for breach of the Plains Agreement; (3) the City was not a public utility charged with providing sewer connections to Builders' proposed development; (4) the City's urban development strategy in the implementation of its general plan, development policies and standards involved fundamental policy decisions in an exercise of the police power; (5) as a result of Builders' failure to perform any of the conditions attached to the county's approval of the tentative subdivision map, Builders was never in a position to receive any benefit from an approval of its application to the City for a certificate; (6) the City acted reasonably in determining that Builders' proposed development was inconsistent with its adopted land use plan, policies and then denying the certificate; and (7) under the circumstances, the granting of a certificate would have been an abuse of discretion.

On appeal, Builders argues that: (1) the court below, as a matter of law, erred in construing the Plains Agreement, and by concluding that Builders was neither a third party beneficiary nor entitled to damages under that

---

[6]Builders' response merely emphasized the low cost aspects of its proposed subdivision.

agreement; (2) in the alternative, even in the absence of a contract, since the City was acting in its proprietary capacity as a public utility and was the only provider of utility services for the Santa Rosa Plain, the City's refusal to grant the certificate was arbitrary and constituted unjust and unlawful discrimination as a matter of law; and (3) the City had no power to act beyond its boundaries.

We turn first to Builders' contention[7] that as a third party beneficiary of the Plains Agreement, it was entitled to damages as the City's refusal to issue the certificate constituted a breach.

Builders contends that it is a third party beneficiary under Civil Code section 1559, which provides: "A contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it." The section excludes enforcement of a contract by persons who are only incidentally or remotely benefited by it. (*Lucas* v. *Hamm* (1961) 56 Cal.2d 583, 590 [15 Cal.Rptr. 821, 364 P.2d 685].) California law follows the classification of persons with enforceable rights under contracts to which they are not parties as either creditor beneficiaries or donee beneficiaries. (Rest., Contracts, §§ 133, subds. (1), (2), 135, 136, 147; 2 Williston on Contracts (3d ed. 1959) § 356; 4 Corbin on Contracts (1951) § 774; see Rest.2d Contracts (Tent. Drafts 1973) § 133, coms. b, c; *Southern Cal. Gas Co.* v. *ABC Construction Co.* (1962) 204 Cal.App.2d 747, 752 [22 Cal.Rptr. 540]; 1 Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, § 500.)

A person cannot be a creditor beneficiary unless the promisor's performance of the contract will discharge some form of legal duty owed to the beneficiary by the promisee. (*Hartman Ranch Co.* v. *Associated Oil Co.* (1937) 10 Cal.2d 232, 244 [73 P.2d 1163]; Rest., Contracts, § 133, subd. (1)(b).) A person is a donee beneficiary only if the promisee's contractual intent is either to make a gift to him or to confer on him a right against the promisor. (Rest., Contracts, § 133, subd. (1)(a).) If the promisee intends to make a gift, the donee beneficiary can recover if such donative intent must have been understood by the promisor from the nature of the contract and the circumstances accompanying its execution. (*Lucas* v. *Hamm, supra,* 56 Cal.2d at pp. 590-591.) This rule does not aid Builders, however, because, as will be seen, no intention to make a gift can be imputed to the City as promisee.

---

[7]Builders' contention is predicated on section 2 of the Plains Agreement which provided: "In the area adjacent to the trunk sewer lines to be constructed in the Santa Rosa Plain, where such lines are located outside the existing City sewer service area established in 1956, the City agrees to adopt a policy to provide sewer service without first requiring annexation to the City, provided that the City may first require annexation of areas which are contiguous to the City or can be annexed by uninhabited annexation proceedings."

■ We agree that Builders did not qualify as a third party beneficiary under this agreement between the City and County. ■ To qualify as a third party beneficiary, one must be part of the class for which the contract was expressly made. This in turn, is determined by the intent of the contracting parties as manifested in the contract and the circumstances surrounding its formation. (*Zigas* v. *Superior Court* (1981) 120 Cal.App.3d 827, 837 [174 Cal.Rptr. 806]; see also *Martinez* v. *Socoma Companies, Inc.* (1974) 11 Cal.3d 394, 401-402 [113 Cal.Rptr. 585, 521 P.2d 841].) In *Martinez,* our Supreme Court applied section 145 of the Restatement of Contracts, as follows at pages 401-402, so far as pertinent:

"Even though a person is not the intended recipient of a gift, he may nevertheless be 'a donee beneficiary if it appears from the terms of the promise in view of the accompanying circumstances that the purpose of the promisee in obtaining the promise . . . is . . . to *confer upon him a right against the promisor* to some performance neither due nor supposed or asserted to be due from the promisee to the beneficiary.' (Rest., Contracts, § 133, subd. (1)(a) [italics supplied]; *Gourmet Lane, Inc.* v. *Keller* (1963) 222 Cal.App.2d 701, 705 [35 Cal.Rptr. 398].) The Government may, of course, deliberately implement a public purpose by including provisions in its contracts which expressly confer on a specified class of third persons a direct right to benefits, or damages in lieu of benefits, against the private contractor. But a governmental intent to confer such a direct right cannot be inferred simply from the fact that the third persons were intended to enjoy the benefits. The Restatement of Contracts makes this clear in dealing specifically with contractual promises to the Government to render services to members of the public: 'A promisor bound . . . to a . . . municipality by contract to do an act or render a service to some or all of the members of the public, is subject to no duty under the contract to such members to give compensation for the injurious consequences of performing or attempting to perform it, or of failing to do so, unless, . . . *an intention is manifested in the contract,* as interpreted in the light of the circumstances surrounding its formation, *that the promisor shall compensate members of the public for such injurious consequences . . . .*' (Rest., Contracts, § 145 (italics supplied); (fn. omitted) see *City and County of San Francisco* v. *Western Air Lines, Inc.* (1962) 204 Cal.App.2d 105, 121 [122 Cal.Rptr. 216].)"

■ The Plains Agreement manifests no intent that the City pay damages to compensate Builders or other members of the public for nonperformance. Paragraph 2 of the agreement must be interpreted in relation to the document as a whole. The stated purposes of the Plains Agreement were the cooperative exercise of police power to prevent a proliferation of fragmented sewer districts and to promote developments in the Santa Rosa Plain consistent with the City and County's jointly adopted general plan.

We do not think either the City nor the County intended to compensate a developer who does not own the property he wishes to subdivide for damages that are at best speculative because he was not granted a permit to hook up to the sewer system.[8] The agreement was made for the public as a whole. As stated by the trial court in its first conclusion of law, it does not create any rights in any *persons* as third party beneficiaries. Any benefits redounding to individual members of the public as a result of this agreement would be incidental and would not give rise to enforcement by those individuals. We hold that the trial court properly concluded that Builders was not a third party beneficiary of the agreement.

Nor is there any merit that the City is liable to Builders for failure to perform a mandatory duty pursuant to Government Code section 815.6, set forth below.[9] Builders argues that the Plains Agreement was an "enactment" within the meaning of the statute. We do not agree as Government Code section 810.6 defines an enactment as a constitutional provision, statute, charter, provision, ordinance or regulation. (See also Law Revision Com., com. to § 815.6.)

The parties agree that the major questions here presented have not been the subject of a published opinion by a California appellate court.

Preliminarily we turn to the appropriate standard of review. After a careful review of the arguments on rehearing and the record, we are convinced there was no constitutionally suspect basis for the City's action. We hold therefore that the proper test is whether the City's action was a reasonable exercise of its police power, and whether, in fact, it bears a reasonable relationship to the public welfare. (Cf. *Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582, 601 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038].) The concept of public welfare is sufficiently broad to encompass the City's desire to grow at an orderly pace and in a compact manner. (Cf. *Construction Ind. Ass'n., Sonoma Co.* v. *City of Petaluma* (9th Cir. 1975) 522 F.2d 897, 908-909; cert. den. 424 U.S. 934 [47 L.Ed.2d 342, 96 S.Ct. 1148].)

---

[8]Thus, Builders is not in a position analogous to the plaintiffs in *Furey* v. *City of Sacramento* (1974) 24 Cal.3d 862 [157 Cal.Rptr. 684, 598 P.2d 844], who paid sewer assessments that were subsequently nullified by a general plan and zoning ordinance designating the property as open space. Significantly, our Supreme Court held that the *Furey* plaintiffs were entitled only to an amelioration of the inequities, not damages by way of inverse condemnation, for the diminution in the value of their property.

[9]The statute provides: "Where a public entity is under a mandatory duty imposed by *an enactment* that is designed to protect against the risk of a particular kind of injury, *the public entity is liable for an injury* of that kind *proximately caused by its failure to discharge the duty* unless the public entity establishes that it exercised reasonable diligence to discharge the duty." (Italics added.)

Builders relies on, and urges us to follow, *Robinson* v. *City of Boulder* (1976) 190 Colo. 357 [547 P.2d 228] and *Delmarva Enterprises, Inc.* v. *Mayor & Coun. of Dover* (Del. 1971) 282 A.2d 601. In both *Robinson* and *Delmarva, supra,* the owners of property outside of the city limits successfully argued that each city had unlawfully discriminated against them by refusing to hook up their properties to the city's exclusive water and sewer services. Both the Delaware and Colorado courts reasoned that: (1) as the exclusive supplier of these services, each city acting in a proprietary capacity as a public utility, was held to the same standards as a private utility, and therefore could refuse to do so only for utility-based reasons, such as insufficient capacity; and (2) each city was bound by the rule that a municipality is without jurisdiction over territory beyond its limits in the absence of legislation. In *Boulder, supra,* at pages 230-231, however, the court did not reach the city's argument that the rules applicable to private utilities should not apply to a governmental utility authorized to implement governmental objectives such as the adoption of a masterplan. The City of Boulder and the county in which it was located had jointly developed and adopted a Boulder Valley comprehensive plan to provide for discretionary land use decisions. The court specifically noted that the proposed Boulder development complied with the county zoning regulations and that the county, rather than the city, had the ultimate responsibility for the approval of the proposed development.

■ Builders argues that the *Boulder* case, *supra,* is on all fours with the facts of the instant case. Builders, however, ignores the fact that its Todd Road project had the tentative approval of the county conditioned, inter alia, upon a change in zoning and other conditions with which Builders admittedly did not attempt to comply. However, we do not base our holding only on this factual distinction. By failing to seek rezoning from the County or meet the other 23 conditions imposed by the County in its tentative approval of the subdivision map, and then pursuing this action against the City, Builders was trying to play off against each other, the City and County who had agreed to cooperative planning. Basically, Builders argues that because a City cannot exercise its police power beyond its boundaries, the City was prevented from using the denial of the sewer hookup as a planning tool.

Builders ignores the joint policy of the City and County as expressed in the Plains Agreement, for orderly growth in conformance with the guidelines of the jointly adopted general plan. Agreements such as that here in issue that lead to joint planning by cities and counties should and have been encouraged by the Legislature.[10] The complex economic, political and so-

[10]Around the time of the Plains Agreement, the Legislature enacted many provisions encouraging the joint and cooperative planning by cities and counties and regions. For exam-

cial factors involved in land use planning are compelling evidence that resolution of the important housing and environmental issues raised here, is the domain of the Legislature. (Cf. *Construction Ind. Ass'n., Sonoma Co. v. City of Petaluma, supra,* 522 F.2d, fn. 17 at p. 909.) Unfortunately, the experience of many communities in this state has been that when planning is left to developers, the result is urban sprawl. The City's express and reiterated reason for denying the certificate was that Builders' proposed development violated its policy of orderly compact development from the urban core, and would result in a "leap-frog" development and "urban sprawl." A municipality cannot be forced to take a stake in the developer's success in the area. (Cf. *Reid Development Corp.* v. *Parsippany-Troy Hills Tp.* (1974) 31 N.J.Super. 459 [107 A.2d 20, at p. 23].) Neither common law nor constitutional law inhibits the broad grant of power to local government officials to refuse to extend utility service so long as they do not act for personal gain nor in a wholly arbitrary or discriminatory manner. (See authorities cited in Ramsay, *Control of the Timing and Location of Government Utility Extensions* (1974) 26 Stan.L.Rev. 945-963.)

Builders relies on the line of California authorities holding that where a municipality provides a public utility service "[g]enerally it is true that where the scope of a project transcends the boundaries of a municipality it ceases to be for a municipal purpose." (*Santa Barbara etc. Agency* v. *All Persons* (1957) 47 Cal.2d 699, 710 [306 P.2d 875], revd. on other grounds (1958) 357 U.S. 275 [2 L.Ed.2d 1313, 78 S.Ct. 1174], dealing with a county water agency.) The California Supreme Court in upholding the right of a charter city to issue notices of sale for revenue bonds for sewerage improvements applied the above principle to sewer systems: ". . . sewer projects may transcend the boundaries of one or several municipalities. . . . In such circumstances the project 'ceases to be a municipal affair and comes within the proper domain and regulation of the general laws of the state.' (*Wilson* v. *City of San Bernardino* (1960) 186 Cal.App.2d 604, 611 . . . .)" (*City of Santa Clara* v. *Von Raesfeld* (1970) 3 Cal.3d 239, 246 [90 Cal.Rptr. 8, 474 P.2d 976]; see also *Pixley* v. *Saunders* (1914) 168 Cal. 152, 160 [141 P. 815].) These authorities, of course, predate *Associated Home Build-*

---

ple, see Government Code sections 65061-65061.4 (creation of regional planning districts, Stats. 1963, ch. 1811, p. 3669), sections 65300, 65307 (authority and scope of general plans). Since 1951 all cities and counties have been required to prepare and adopt a general plan. (Gov. Code, § 65300, Stats. 1965, ch. 1880, p. 4334.) In 1965 charter cities were exempted from some of the local planning requirements; they are not exempt from the planning elements prescribed by article 5 (commencing with Gov. Code, § 65300) if a general plan is adopted under their charter. (Gov. Code, § 65700, added by Stats. 1965, ch. 1880, § 5, p. 4334.) Government Code section 65302 as originally enacted by Statutes 1965, chapter 1880, section 5, page 4334 required a land use element (which included population density) and a circulation element. The "housing element" which shall make adequate provision for the housing needs of all economic segments of the community, was added by Statutes 1967, chapter 1658, section 1, page 4033. Since then Government Code section 65302 has been amended repeatedly to require more detailed general plan elements of charter cities.

*ers etc., Inc.* v. *City of Livermore, supra,* 18 Cal.3d 582, 601. We agree with the City that unlike the situation in the past, most municipalities today are neither isolated nor wholly independent from neighboring entities, and consequently, land use decisions by one local unit affect the needs and resources of the entire region. The Plains Agreement and the general plan demonstrate that the City and County were aware of these realities.

Builders recognizes that in this state, as elsewhere, publicly owned municipal utilities are not regulated by the Public Utilities Commission or any other supervisory agency in the absence of a legislative grant of authority while privately owned utilities are. (*American Microsystems, Inc.* v. *City of Santa Clara* (1982) 137 Cal.App.3d 1037, 1042-1043 [187 Cal.Rptr. 550].) ▮ It has long been the rule in this state that when operating a municipal utility, a city retains its character as a municipal corporation. Reasons must be found for holding it liable to the same extent as a private utility corporation. (*City of Pasadena* v. *Railroad Commission* (1920) 183 Cal. 526, 530 [192 P.25, 10 A.L.R. 1425].) Builders here argues that there were sufficient reasons here because the City was the only supplier, could not act beyond its boundaries and could not use sewer hookup as a planning device. We do not agree.

In *Associated Home Builders, etc., Inc.* v. *City of Livermore, supra,* 18 Cal.3d 582, 601, our Supreme Court intimated that in California a city may enact restrictions that are effective beyond its boundaries. *Associated Home Builders* also reiterated the desirability of regional planning. As to a city's alleged inability to act beyond its boundaries, we note that Government Code section 65859 set forth below,[11] a part of the same enactment as Government Code sections 65300 and 65302 (discussed above at fn. 10 on p. 530) expressly provides otherwise.

Builders' contention that denial of the certificate could not be used as a planning device overlooks a fundamental distinction between such a decision as an improper initial use of the police power, and as here, a necessary and proper exercise of the power once the planning decision had been made. ▮ Here, of course, the adoption of the general plan with its policy of orderly and compact growth to avoid urban sprawl was made in 1967.

---

[11]"§ 65859.A city *may prezone unincorporated territory adjoining the city for the purpose of determining the zoning* that will apply to such property in *the event of subsequent annexation to the city.* The method of accomplishing such prezoning shall be as provided by this chapter for zoning within the city. Such zoning shall become effective at the same time that the annexation becomes effective.

"If a city has not prezoned territory which is annexed, it may adopt an interim ordinance in accordance with the provisions of Section 65858." (Italics added.)

The policy was a proper exercise of the police power for the general welfare (*Associated Home Builders, supra,* 18 Cal.3d 601; cf. *Wilson* v. *Hidden Valley Mun. Water Dist.* (1967) 256 Cal.App.2d 271, 288 [63 Cal.Rptr. 889]) previously adopted by the City Council and the County. (Cf. *Golden* v. *Planning Board of Town of Ramapo* (1972) 30 N.Y.2d 359 [334 N.Y.S.2d 138, 285 N.E.2d 291, 63 A.L.R.3d 1157], app. dism. 409 U.S. 1003 [34 L.Ed.2d 294, 93 S.Ct. 436, 93 S.Ct. 440].) Builders' argument that only zoning may be used for planning sits poorly in its mouth as it never sought to rezone the property or meet any of the County's other conditions.

The judgment is affirmed.

Feinberg, J., and Barry-Deal, J., concurred.

A petition for a rehearing was denied September 23, 1983, and appellant's petition for a hearing by the Supreme Court was denied October 27, 1983.