[No. F056506. Fifth Dist. Mar. 3, 2010.]

MARY JANE GALBISO, Plaintiff and Appellant, v.
OROSI PUBLIC UTILITY DISTRICT, Defendant and Respondent.

COUNSEL

Law Office of Frederick C. Roesti and Frederick C. Roesti for Plaintiff and Appellant.

Law Offices of Michael J. Lampe and Michael P. Smith for Defendant and Respondent.

OPINION

KANE, J.—Plaintiff Mary Jane Galbiso (Galbiso) appeals from a judgment entered in favor of defendant Orosi Public Utility District (OPUD) after the trial court sustained OPUD's demurrer to Galbiso's complaint without leave to amend. Galbiso's complaint sought a preliminary injunction to prevent OPUD from conducting a "tax sale" of her two parcels for the collection of sewer assessments, and a writ of mandate to correct OPUD's alleged abuse of discretion in refusing to grant her request for a reassessment. The trial court concluded, among other things, that the complaint failed to allege a sufficient legal or factual basis to enjoin the tax sale or require a reassessment of Galbiso's parcels. On appeal, Galbiso contends her complaint adequately

alleged one or more of her claims for relief and, in any event, leave to amend should have been allowed. We disagree and affirm the judgment.[1]

## FACTS AND PROCEDURAL HISTORY

This case is the latest in a series of legal battles between OPUD and Galbiso concerning the sewer assessments imposed by OPUD against Galbiso's real property and the efforts undertaken by OPUD to enforce those assessments. As background to the present case, we begin with a brief synopsis of the parties' previous appeals in this court.

A.  *The Two Prior Appeals*

1.  *First Appeal—The Foreclosure Action*

In *Orosi Public Utility Dist. v. Galbiso* (Nov. 9, 2007, F049450) (nonpub. opn.) (*OPUD v. Galbiso*), OPUD initiated a judicial foreclosure action to recover unpaid sewer assessments owed by Galbiso. At the time of trial, the case was expanded to include a number of assessment-related issues submitted by the parties for declaratory relief. OPUD prevailed in the trial court, Galbiso appealed, and we reversed the judgment in part.

As outlined in our nonpublished opinion in *OPUD v. Galbiso, supra,* F049450, the underlying facts of that case included the following: In 1995, OPUD formed a special assessment district, known as the Orosi 1995 Sewer Improvement District No. 1, to make improvements to its sewer system to be paid for by special assessments against property owners whose parcels would benefit from the improvements. A notice of assessment was recorded against the affected parcels in July of 2001. Galbiso was the owner of two parcels of undeveloped land, referred to as parcels 56 and 57, located within the geographic boundaries of OPUD. She purchased parcel 56 in 2001 and parcel 57 in 2003. Galbiso first learned of the special assessments shortly before completing her purchase of parcel 56 in 2001. She proceeded with the purchase, despite her awareness of the assessment, in hopes that the assessment issue would be worked out in a satisfactory way between her and the OPUD board. (*OPUD v. Galbiso, supra,* F049450.)

Galbiso believed the special assessments imposed against her properties were unreasonable, unfair and/or unenforceable because (1) they were based on a previous owner's abandoned proposal to build a multiunit residential

---

[1] We take judicial notice of our opinions in the two prior appeals between these parties. We decline Galbiso's request to judicially notice the documentary evidence that was filed as part of the record in those cases.

complex needing 88 sewer hookups, (2) Galbiso would use parcels 56 and 57 for organic farming and she needed only one or two sewer hookups, not 88, and (3) although OPUD charged Galbiso for 88 sewer hookups, it could not actually provide sewer treatment capacity for that many residential units. Although efforts were made by both sides to resolve the matter through a deferral agreement or other compromise, OPUD ultimately took the position that Galbiso's land received the benefit of the sewer improvements, she knew about the assessments when she purchased the parcels, and she must pay the sums assessed. (*OPUD v. Galbiso, supra,* F049450.)

In 2003, OPUD filed its complaint to judicially foreclose and sell parcels 56 and 57 for nonpayment of special sewer assessments, which case was *Orosi Public Utility Dist. v. Galbiso* (Super. Ct. Tulare County, 2005, No. 03-207142). The remedy of judicial foreclosure was sought by OPUD in its complaint pursuant to section 8830 of the Streets and Highways Code,[2] which section is a part of the Improvement Bond Act of 1915 (§ 8500 et seq.). The assessment had been initiated under a distinct statutory scheme known as the Municipal Improvement Act of 1913 (§ 10000 et seq.; hereafter the 1913 Act). At the time of trial, both parties requested that the complaint be deemed to state a claim for declaratory relief on certain issues related to the assessments. The trial court granted that request. After completion of the trial, the trial court resolved all of the submitted issues in OPUD's favor, including that Galbiso's property received a proportional benefit from the sewer improvements; that no reassessment by OPUD was required based on changed circumstances; and that OPUD was entitled to bring an action to foreclose under section 8830. A judgment granting foreclosure and determining the submitted issues was entered, and Galbiso appealed. (*OPUD v. Galbiso, supra,* F049450.)

On appeal from the judgment, we concluded that the trial court had no authority to grant judicial foreclosure under section 8830, since that section was inapplicable to the assessment proceedings involved in that case. In particular, we found that section 8830 did not apply because no bond proceedings were initiated under the Improvement Bond Act of 1915, of which section 8830 was a part. (*OPUD v. Galbiso, supra,* F049450.) Accordingly, the portion of the judgment that had granted judicial foreclosure was reversed. In so holding, we noted that the remedy authorized by the applicable statutory scheme (i.e., the 1913 Act) was *a tax sale,* not judicial foreclosure. (*OPUD v. Galbiso, supra,* F049450.) We affirmed the balance of the judgment, including the trial court's determination of issues submitted for declaratory relief. (*Ibid.*) In regard to those issues, we explained, among other things, that Galbiso's challenge to the validity of the original assessment was

---

[2] Unless otherwise indicated, all further statutory references are to the Streets and Highways Code.

barred by the statute of limitations, and that OPUD was not required to reassess her property or take other corrective action based on changed circumstances or equitable considerations, although OPUD had discretion to do so. (*Ibid.*)

We commented in passing that (1) OPUD could have reassessed Galbiso's parcels (i.e., it was not barred from doing so, as it previously believed), and (2) OPUD "presumably" had discretion to proceed with a tax sale under the applicable assessment statute. (*OPUD v. Galbiso, supra,* F049450.)

    2.   *Second Appeal—Action to Enforce Brown Act and Public Records Act*

The second appeal arising out of the parties' ongoing controversy was *Galbiso v. Orosi Public Utility Dist.* (2008) 167 Cal.App.4th 1063 [84 Cal.Rptr.3d 788]. In that case, which was commenced in Tulare County Superior Court as *Galbiso v. Orosi Public Utility Dist.* (2007, No. 217318), Galbiso brought suit to prevent OPUD from proceeding with a 2006 tax sale of parcels 56 and 57. She alleged, among other things, that OPUD's board of directors' resolution approving the tax sale was invalid under the Ralph M. Brown Act (Gov. Code, § 54950 et seq.; hereafter the Brown Act), and that OPUD had also violated the California Public Records Act (Gov. Code, § 6250 et seq.; hereafter the Public Records Act). Galbiso additionally sought to quiet title or to obtain declaratory relief relating to parcels 56 and 57 on the ground that the assessment, or the lien securing the assessment, was invalid.

Prior to trial, the parties settled. OPUD agreed that it would not take any action to commence or to proceed with a tax sale of Galbiso's parcels until after the conclusion of the appeal in the foreclosure action (i.e., the first appeal—see above), and that it (OPUD) would refrain from specified conduct that Galbiso's complaint alleged was in violation of the Brown Act and the Public Records Act. In exchange, Galbiso agreed to dismiss her lawsuit with prejudice. As part of the settlement, the parties reserved the issue of statutory attorney fees under the Brown Act and the Public Records Act for determination by the trial court in a subsequent hearing. Thereafter, when the trial court denied her motion for recovery of statutory attorney fees, Galbiso appealed. (*Galbiso v. Orosi Public Utility Dist., supra,* 167 Cal.App.4th at pp. 1068–1075.) In that published opinion, we reversed the trial court's order denying attorney fees under the Brown Act and the Public Records Act and remanded the case to the trial court. (*Galbiso v. Orosi Public Utility Dist., supra,* at p. 1090.)

B.   *The Present Case*

In November of 2007, in a somewhat remarkable turn of events, Galbiso was elected to the OPUD board of directors. Her election, however, did not

awaken a spirit of greater cooperation or compromise between the parties. If anything, as reflected by subsequent developments, the parties' positions regarding the assessments on parcels 56 and 57 had become even more entrenched.

On November 9, 2007, our opinion in the first appeal, *OPUD v. Galbiso, supra,* F049450, was issued. As discussed above, in that opinion we reversed the portion of the judgment that granted judicial foreclosure. We also briefly noted, in passing, that OPUD could have reassessed Galbiso's parcels (i.e., a legal basis existed for doing so), and that OPUD "presumably" had discretion to proceed with a tax sale under the applicable assessment statute. (*Ibid.*) In the months that followed our opinion in *OPUD v. Galbiso,* Galbiso offered a particular formula for reassessment of her parcels in connection with a global settlement proposal to OPUD, while OPUD, after considering and rejecting Galbiso's proposal, pursued a tax sale. Specifically, in May of 2008, Galbiso made a written request to OPUD that it reassess parcels 56 and 57 according to their agricultural use. That request was summarily denied and, instead of approving the proposed reassessment, a majority of OPUD's board of directors voted on May 13, 2008 (in resolution No. 2008-02), to hold a tax sale of Galbiso's parcels to collect the delinquent assessments. The tax sale was noticed for July 1, 2008.

Galbiso filed her complaint in the present case on June 27, 2008. The complaint, filed as Tulare County Superior Court case No. VCU228671, included several causes of action for injunctive relief to prevent the tax sale from going forward. On June 30, 2008, the trial court issued a temporary restraining order to maintain the status quo until a hearing could be held on Galbiso's request for a preliminary injunction. On August 15, 2008, the trial court denied the requested injunctive relief. Thus, OPUD was allowed to proceed with the tax sale on August 18, 2008, as scheduled. Galbiso paid the delinquent assessments due on one parcel before the tax sale, and she paid the delinquent assessments due on the other parcel shortly after the tax sale. She therefore was able to keep or redeem both parcels.

OPUD then filed a general demurrer to Galbiso's complaint. The complaint had alleged the following purported claims for relief: (1) enjoin tax sale (the statutory time limit for a tax sale allegedly expired); (2) enjoin tax sale (OPUD allegedly made a binding election to pursue other remedies); (3) nullification of tax sale (OPUD allegedly did not comply with Brown Act); (4) declaratory relief (OPUD's Brown Act violation allegedly necessitated declaratory relief); (5) petition for writ of mandate (OPUD's decision to conduct tax sale beyond the statutory time limit was allegedly an abuse of discretion); and (6) petition for writ of mandate (OPUD's rejection of Galbiso's request for reassessment was allegedly an abuse of discretion). On

August 28, 2008, the trial court sustained OPUD's demurrer to the entire complaint *without* leave to amend. A judgment of dismissal was entered on September 12, 2008. Galbiso's timely notice of appeal followed.

## DISCUSSION

I. *Standard of Review*

"In reviewing the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules. 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff. [Citation.]" (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].)

II. *The Trial Court Correctly Sustained General Demurrer to Complaint for Injunctive Relief*

A. *Causes of Action Premised on Section 10405*

Galbiso's first cause of action for injunctive relief alleged that OPUD had no authority to conduct the tax sale because that remedy was *time-barred* under the provisions of section 10405. (She also alleged the same claim as a distinct ground for a writ of mandate, but we treat that as in essence the same cause of action.) The trial court sustained OPUD's demurrer to the cause of action, holding that section 10405 is "not a statute of limitations for conducting a tax sale but is only directory." Galbiso contends the trial court erred in its construction of the statute. We disagree.

Section 10405 provides as follows: "*The tax collector shall fix a time and place for the sale of various parcels of land upon which the assessments are unpaid, which date shall be not less than 60 days nor more than six months after the date of the recordation of the diagram and assessment.*" (Italics added.) According to the allegations of the complaint and attachments thereto, the recordation of OPUD's diagram and assessment occurred in July of 2001. Assuming the date of recordation is correct, it is clear that the 2008 tax sale

in the present case was beyond the six-month time period indicated in the statute. Galbiso argues that section 10405 is mandatory and jurisdictional, and thus the six-month time period must be construed as a statute of limitations. OPUD counters that the time requirement in section 10405 is merely directory, and therefore OPUD still had authority to hold a tax sale after the six-month period expired. We believe that OPUD is correct, as we now explain.

■ As a preliminary matter, it is necessary to provide a greater elaboration of the mandatory-directory distinction, which must not be confused with the distinction between mandatory and permissive provisions in a statute. The two dichotomies are not the same, as our Supreme Court explained at length in the case of *People v. McGee* (1977) 19 Cal.3d 948, 958 [140 Cal.Rptr. 657, 568 P.2d 382], as follows: "In determining the proper effect to be given this statutory language, we undertake at the outset to clarify some confusion in terminology that has frequently inhibited analysis of similar questions of statutory interpretation in the past. Traditionally, the question of whether a public official's failure to comply with a statutory procedure should have the effect of invalidating a subsequent governmental action has been characterized as a question of whether the statute should be accorded 'mandatory' or 'directory' effect. If the failure is determined to have an invalidating effect, the statute is said to be mandatory; if the failure is determined not to invalidate subsequent action, the statute is said to be directory. As we explain below, in evaluating whether a provision is to be accorded mandatory or directory effect, courts look to the purpose of the procedural requirement to determine whether invalidation is necessary to promote the statutory design."

■ "Although the parties to this action have utilized the mandatory-directory terminology in their briefs, both parties, sharing the confusion exhibited in some past judicial decisions, have improperly equated the mandatory-directory duality with the linguistically similar, but analytically distinct, 'mandatory-permissive' dichotomy. As we explained recently in *Morris v. County of Marin* (1977) 18 Cal.3d 901, 908 [136 Cal.Rptr. 251, 559 P.2d 606], in the latter context 'the term "mandatory" refers to an obligatory [procedure] which a governmental entity is required to [follow] as opposed to a permissive [procedure] which a governmental entity may [follow] or not as it chooses. By contrast, the "directory" or "mandatory" designation does not refer to whether a particular statutory requirement is "permissive" or "obligatory," but instead simply denotes whether the failure to comply with a particular procedural step will or will not have the effect of invalidating the governmental action to which the procedural requirement relates. [Citations.]' [Citation.] [¶] Although the mandatory-directory and obligatory-permissive dichotomies are thus analytically distinct, in some instances there is an obvious relationship between the two. If, for example, a statute simply embodies a permissive procedure with which a governmental

entity may or may not comply as it chooses, the entity's failure to comply will generally not invalidate the entity's subsequent action. The converse of this proposition is not always true, however, for as we observed in *Morris*, '[m]any statutory provisions which are "mandatory" in the obligatory sense are accorded only "directory" effect.' [Citation.]" (*People v. McGee, supra*, 19 Cal.3d at pp. 958–959; see also *Woods v. Department of Motor Vehicles* (1989) 211 Cal.App.3d 1263, 1266–1267 [259 Cal.Rptr. 885].)

■ In addressing the issue of whether the time requirement set forth in section 10405 is directory, we follow established rules of statutory construction. " 'In order to determine whether a particular statutory provision . . . is mandatory or directory, the court, as in all cases of statutory construction and interpretation, must ascertain the legislative intent. In the absence of express language, the intent must be gathered from the terms of the statute construed as a whole, from the nature and character of the act to be done, and from the consequences which would follow the doing or failure to do the particular act at the required time. [Citation.] When the object is to subserve some public purpose, the provision may be held directory or mandatory as will best accomplish that purpose [citation] . . . .' " (*Morris v. County of Marin, supra*, 18 Cal.3d 901, 910, fn. omitted.)

Here, neither party has directed our attention to any legislative history or materials regarding section 10405 that might shed further light on the legislative purpose for the six-month period therein, and our own search has not uncovered that information. Nonetheless, the purpose of the time limitation set forth in section 10405 is reasonably apparent when that section is considered in light of the 1913 Act as a whole, of which section 10405 is a part.

■ The 1913 Act is plainly a statutory mechanism to finance, build and maintain municipal improvements, including provisions for creation of assessment districts, levying of assessments on properties that are specially benefited by the works of improvement, and collection of the sums levied. (See §§ 10000–10706.) By its own terms, the entire 1913 Act is to be "liberally construed in order to effectuate its purposes." (§ 10012.) The section providing for liberal construction adds that "[n]o error, irregularity, informality . . . in any procedure taken under this division, which does not directly affect the jurisdiction of the legislative body to order the work or improvement, shall avoid or invalidate such proceeding or any assessment for the cost of work done thereunder." (*Ibid.*)

■ Procedures for collecting assessments are set forth in chapter 5 of the 1913 Act. (§§ 10400–10430.) In the event of a delinquency, unpaid assessments are collected by means of a tax sale process that is provided for in

sections 10405 through 10423. In addition, if bonds are issued under the Improvement Bond Act of 1915 (§ 8500) or the Improvement Act of 1911 (§ 5000), additional enforcement remedies may be available under the provisions of those other enactments. (See § 10600.) Thus, the primary enforcement mechanism if bonds are *not* issued, as was the case here, is the tax sale process.

■ One of the salient features of the 1913 Act is that assessments may be collected *up front*, prior to commencement of the work of improvement. (*Schuetram v. Granada Sanitary Dist.* (1964) 229 Cal.App.2d 25, 29–30 [39 Cal.Rptr. 919] [under the 1913 Act, assessments may be collected before the work is performed, unlike the system under the Improvement Act of 1911].) Provision is made in the 1913 Act for prompt collection of assessments by the tax collector once the approved assessment and diagram have been transmitted to, and duly recorded by, the tax collector. (§§ 10402–10404.) A notice of recordation is then provided to the property owner specifying the amount due under the assessment and the consequences of failure to pay within 30 days. (§ 10404.) After this 30-day period expires, section 10405 directs the tax collector to fix a time and place for a tax sale, which date "shall be not less than 60 days nor more than six months after the date of the recordation of the diagram and assessment." (§ 10405.)

■ The rationale for the prompt collection process is clearly the need to provide a source of funds to begin the work of improvement. The monies collected by the assessment are placed in a special fund out of which the costs of the improvement are to be paid. (§ 10424.) Bonds *may* also be sold to finance the improvement, but a sale of bonds is not required. (§§ 10402, 10600.) If the first assessment and (any) sale of bonds are insufficient to raise funds to pay the cost of the improvement, a supplemental assessment may be levied. (§ 10425.)

■ As this brief summary of the 1913 Act reflects, the six-month provision in section 10405 is simply to ensure that the tax collector takes action to collect the assessments in a reasonably prompt fashion so that the needed improvement will be timely financed. That is, the statute provides for a prompt collection of assessments "up front" so that there will be funds immediately available for the improvement project, since it is not a foregone conclusion under the 1913 Act that any bonds will be issued. Where no bonds are issued, and no other funding source is available, prompt collection of the assessment is the only way forward.

■ However, there is no indication in the 1913 Act that the time requirement set forth in section 10405 is mandatory or jurisdictional. That is, it does not appear to constitute a statute of limitations or a jurisdictional

barrier to utilizing the tax sale process. As helpfully summarized in *Woods v. Department of Motor Vehicles, supra*, 211 Cal.App.3d at page 1267, such time requirements are generally construed as directory unless a contrary intention appears: "Significantly our Supreme Court has held that 'generally, requirements relating to the time within which an act must be done are directory rather than mandatory or jurisdictional, unless a contrary intent is clearly expressed. [Citations.] In ascertaining probable intent, California courts have expressed a variety of tests. In some cases focus has been directed at the likely consequences of holding a particular time limitation mandatory, in an attempt to ascertain whether those consequences would defeat or promote the purpose of the enactment. [Citations.] Other cases have suggested that a time limitation is deemed merely directory "unless a consequence or penalty is provided for failure to do the act within the time commanded." [Citations.]' "

Here, we observe that section 10405 contains no penalty for failure to comply with the time requirements, unlike most statutes of limitations. An apt comparison may be made to section 10400, which *does* set forth a statute of limitations for challenges to the validity of an assessment. That section expressly provides that the validity of an assessment "shall not be contested in any action or proceeding" unless the time limitation set forth therein is met. Thus, consequences of failure to meet the stated deadline were built into section 10400, a statute of limitations, but that is not the case in section 10405.

Additionally, to interpret section 10405 as a strict statute of limitations would impede the purposes of the 1913 Act. The 1913 Act allows for alternative means of payment and flexibility in regard to collection. For example, payments of assessments may be deferred when bonds are issued, may be payable in installments, or may be postponed by a deferral agreement. (See, e.g., §§ 10204, 10402, 10555, 10700.) In such circumstances, property owners might become delinquent long after the expiration of the initial six-month period. We think it would be unreasonable to hold that the Legislature, by enacting section 10405, intended that in such cases the public entity would forfeit any and all rights to pursue a tax sale. For all of these reasons, we conclude that section 10405 is *directory*. (See *Cake v. City of Los Angeles* (1913) 164 Cal. 705, 709–710 [130 P. 723] [60-day time period for completing assessment under the Street Opening Act of 1903 was "directory"].) Therefore, OPUD did not lose its right to pursue a tax sale in this case after the expiration of the statute's six-month period. The trial court correctly sustained the demurrer to the causes of action premised on section 10405 without leave to amend.

### B.  Cause of Action Based on Election of Remedies

The second cause of action sought to enjoin the tax sale on the ground that OPUD previously made a *binding election of remedies* to obtain a judicial foreclosure. The doctrine of election of remedies is clearly inapplicable here, for several reasons. First, "[a] party should be entitled to change alternative remedies until satisfaction of judgment, or application of res judicata or estoppel, vindicates one of the inconsistent rights." (*Southern Christian Leadership Conference v. Al Malaikah Auditorium Co.* (1991) 230 Cal.App.3d 207, 223 [281 Cal.Rptr. 216].) Here, OPUD obtained a foreclosure judgment that was ultimately reversed on appeal. Since OPUD never realized the benefit of that judgment, and the judgment was set aside, it should be able to pursue other remedies. Second, OPUD's decision to pursue judicial foreclosure was mistaken, since its "real" remedy under the applicable statute was a tax sale. Now that OPUD's initial mistake of remedies has been corrected, it is not barred from pursuing its actual remedy. " 'If [the] plaintiff was mistaken and undertook to avail himself of a remedy that he was never entitled to, this does not prevent him from subsequently availing himself of a remedy that he is entitled to under the facts of the case.' [Citations.]" (*Waters v. Woods* (1935) 5 Cal.App.2d 483, 490 [42 P.2d 1072].) Finally, even if both remedies had been available at the same time, Galbiso has failed to show that the two were inconsistent, rather than simply alternative or cumulative remedies. (See 3 Witkin, Cal. Procedure (5th ed. 2008) Actions, §§ 193–194, pp. 275–276.) For all of these reasons, the trial court correctly sustained the demurrer to the second cause of action without leave to amend.

### C.  Causes of Action Premised on Brown Act Violation

In the third cause of action of her complaint, Galbiso sought to enjoin the tax sale of parcels 56 and 57 on the ground that OPUD's resolution to pursue that remedy was invalid. Allegedly, OPUD's decision to proceed with a tax sale violated section 54953 of the Brown Act, which section provides, among other things, that "[a]ll meetings of the legislative body of a local agency shall be open and public . . . ." (Gov. Code, § 54953, subd. (a).) As recourse for the alleged violation, the third cause of action requested the trial court to *nullify* OPUD's resolution approving the tax sale (per Gov. Code, § 54960.1, subd. (a)), and on that basis to enjoin the tax sale.

The trial court sustained the demurrer to the third cause of action on the grounds of (1) lack of standing to sue, and (2) failure to state facts constituting a violation of the Brown Act. We first address the issue of standing. In a nutshell, when a person becomes a member of a governing body of a public entity, that person forfeits standing *as a taxpayer-citizen* to

sue that public entity. (*Holbrook v. City of Santa Monica* (2006) 144 Cal.App.4th 1242, 1257 [51 Cal.Rptr.3d 181]; *Carsten v. Psychology Examining Com.* (1980) 27 Cal.3d 793, 797–798 [166 Cal.Rptr. 844, 614 P.2d 276].) Although it is true that Galbiso lacked standing as a member of the general public to sue OPUD for Brown Act violations, since she served on its board of directors, we do not believe that she asserted the third cause of action merely as a member of the general public. Rather, she had a personal stake in the outcome of the relief sought; specifically, whether the tax sale of *her* parcels would stand. That being the case, the demurrer to the third cause of action based on a lack of standing under the analysis of the above cases should have been overruled. (See *Carsten v. Psychology Examining Com., supra*, at p. 798 [exception to rule exists where member of board had personal interest in outcome of litigation].)

We now turn to the issue of whether Galbiso's third cause of action stated facts sufficient to constitute a violation of the Brown Act. The only facts alleged in support thereof were that sometime before the public meeting was held to discuss the tax sale, attorneys for OPUD "made public announcement[s]" in the newspaper or elsewhere indicating that OPUD would be pursuing a tax sale or a foreclosure remedy. In light of these so-called announcements, Galbiso alleged that OPUD must have *already decided* to proceed with the tax sale in advance of the public meeting on that issue. Her complaint makes no allegation that a secret meeting actually took place, but that is presumably what is being suggested.[3] In opposition filed in the trial court to OPUD's demurrer, Galbiso's attorney acknowledged that the cause of action was premised on OPUD allegedly holding "private meetings" to decide the tax sale issue.

We agree with the position set forth in OPUD's brief as respondent herein, that the comments made by its attorneys do not give rise to an inference that a secret meeting took place. One of the referenced comments was merely a statement in The Fresno Bee to the effect that OPUD "probably will consider" going forward with a tax sale. The other was made by OPUD's attorney at a May 5, 2008, court hearing on whether Galbiso was entitled to attorney fees under Code of Civil Procedure section 1021.5 following her partly successful appeal in *Orosi Public Utility Dist. v. Galbiso, supra*,

---

[3] A "meeting" is defined in Government Code section 54952.2, subdivision (a), as any "congregation of a majority of the members of a legislative body" at the same time and place "to hear, discuss, [or] deliberate" a matter that is within the subject matter jurisdiction of the legislative body. The version of Government Code former section 54952.2, subdivision (b), that was in effect at the time of the conduct alleged herein included the following prohibition: "Except as authorized pursuant to Section 54953, any use of direct communication, personal intermediaries, or technological devices that is employed by a majority of the members of the legislative body to develop a collective concurrence as to action to be taken on an item by the members of the legislative body is prohibited."

No. 03-207142 (i.e., the foreclosure action). OPUD's attorney argued at that hearing that Galbiso's defense of the foreclosure action conferred no benefit on the public or anyone else since OPUD was still entitled to proceed with the tax sale, and he thought that OPUD was "moving forward" with that remedy.[4]

These brief comments made by OPUD's attorneys, when viewed in the context of the parties' ongoing litigation, were insufficient as a matter of law to show the alleged Brown Act violation. We cannot ignore the fact that OPUD previously resolved to use the tax sale remedy with respect to parcels 56 and 57, but agreed to hold off until after the appeal of the foreclosure action was concluded. That agreement was part of the settlement reached in *Galbiso v. Orosi Public Utility Dist., supra*, No. 217318. (*Galbiso v. Orosi Public Utility Dist., supra*, 167 Cal.App.4th at pp. 1069–1070 [prior resolution to use tax sale remedy] & pp. 1072–1074 [settlement terms summarized, including postponement of tax sale remedy].) When we subsequently held in the foreclosure action that the applicable remedy under the 1913 Act was a tax sale (*OPUD v. Galbiso, supra*, F049450 [since no bonds were issued, remedy was tax sale, not judicial foreclosure]), it was not surprising that OPUD would thereafter resolve to move forward with that remedy. OPUD had consistently sought to collect the unpaid assessments levied against Galbiso's parcels. In such a context, the remarks by OPUD's attorneys do not suggest that any wrongdoing occurred. If any inference may be drawn, it would be that OPUD's attorneys merely stated what seemed to be the probable or inevitable outcome of the matter—i.e., that OPUD would press forward with the tax sale. In any event, we hold that the attorneys' passing remarks did not constitute a sufficient factual basis for a claim that OPUD secretly met and decided the matter beforehand. Since no other facts were set forth in the complaint to support the alleged Brown Act violation, we hold that Galbiso failed to state a cause of action.

■ There is yet another reason the third cause of action was deficient. The cases have held that a violation of the Brown Act will not automatically invalidate an action taken by a local agency or legislative body. The facts must show, in addition, that there was *prejudice* caused by the alleged violation. (*Cohan v. City of Thousand Oaks* (1994) 30 Cal.App.4th 547,

---

[4] Although the complaint only generally alluded to the nature of the remarks made by OPUD's attorneys, the parties provided a greater elaboration thereof in connection with the demurrer and the motion for preliminary injunction. OPUD's attorney appearing at the May 5, 2008, hearing of the attorney fees motion was Michael Smith. Mr. Smith's declaration in opposition to the preliminary injunction briefly described his comments regarding the tax sale that he made at the May 5, 2008, hearing. The substance of what he said there is not materially disputed. Mr. Smith's declaration also stated that at that time he "had never spoken to any OPUD board member about Galbiso, her property, a tax sale, or any of her litigation, nor [was he] aware of any secret or unnoticed meetings by OPUD."

555–556 [35 Cal.Rptr.2d 782]; *North Pacifica LLC v. California Coastal Com.* (2008) 166 Cal.App.4th 1416, 1433 [83 Cal.Rptr.3d 636].) "Even where a plaintiff has satisfied the threshold procedural requirements to set aside an agency's action, Brown Act violations will not necessarily 'invalidate a decision. [Citation.] Appellants must show prejudice.' [Citation.]" (*San Lorenzo Valley Community Advocates for Responsible Education v. San Lorenzo Valley Unified School Dist.* (2006) 139 Cal.App.4th 1356, 1410 [44 Cal.Rptr.3d 128].) Here, no facts are alleged to show that Galbiso was prejudiced in any way by the alleged violation. Moreover, in light of the long history of this assessment dispute and litigation in which both parties were well aware of the other side's position and arguments, no prejudice is apparent.

For all of the reasons noted above, Galbiso failed to allege facts sufficient to state a Brown Act violation and the trial court correctly sustained the demurrer to the third cause of action. Galbiso failed to present any factual basis for leave to amend the third cause of action, as was her burden. (*Smith v. State Farm Mutual Automobile Ins. Co.* (2001) 93 Cal.App.4th 700, 711 [113 Cal.Rptr.2d 399].) We conclude that the trial court correctly denied leave to amend.

We now turn to the fourth cause of action, in which Galbiso sought the following declaratory relief: "[T]hat when OPUD goes into closed session, and publicly announces its decision, the . . . Brown Act requires OPUD to state what the decision [or] action was, the person who made the motion, the person who seconded the motion, and the persons who voted for and against the motion." The relief sought was prospective only and, unlike in the third cause of action, Galbiso had no personal interest at stake in the outcome. Thus, the fourth cause of action was asserted by Galbiso as an interested member of the public (i.e., a taxpayer-citizen) in order to ensure compliance with the Brown Act in *future* meetings. However, as an elected member of the OPUD board of directors, Galbiso lacked standing to maintain such a cause of action. (*Holbrook v. City of Santa Monica, supra,* 144 Cal.App.4th at p. 1257; *Carsten v. Psychology Examining Com., supra,* 27 Cal.3d at pp. 797–798.) Moreover, the requested declaratory relief was unnecessary because a legislative body's duties to publicly report any actions taken in closed session and the votes of each member are clearly spelled out in statute (see Gov. Code, § 54957.1), and substantially the same legal issue was raised and resolved as part of the settlement in *Galbiso v. Orosi Public Utility Dist., supra,* No. 217318 (see *Galbiso v. Orosi Public Utility Dist., supra,* 167 Cal.App.4th at p. 1073). We hold that the trial court correctly sustained the demurrer to the fourth cause of action without leave to amend.

III. *The Trial Court Correctly Sustained General Demurrer to Writ of Mandate Petition*

This brings us to the final claim for relief alleged in Galbiso's complaint; namely, her petition for a writ of mandate based on OPUD's refusal to grant her request for a reassessment of parcels 56 and 57. Allegedly, OPUD's refusal to grant such a reassessment of her parcels constituted an abuse of discretion. The trial court sustained OPUD's demurrer on the ground that although OPUD had discretion to grant a reassessment, it had no mandatory duty to do so.

In our nonpublished opinion in *OPUD v. Galbiso, supra*, F049450, we noted that OPUD had discretionary power to grant a reassessment. We stated that although the 1913 Act does not have its own procedural mechanism for reassessment, section 10600 thereof has been construed to incorporate all the curative clauses and powers of reassessment provided under the Improvement Act of 1911 and the Improvement Bond Act of 1915 (*Harrison v. Board of Supervisors* (1975) 44 Cal.App.3d 852, 864 [118 Cal.Rptr. 828]), even if bonds have not been issued (*Brenkwitz v. City of Santa Cruz* (1969) 272 Cal.App.2d 812, 817 [77 Cal.Rptr. 705]). (*OPUD v. Galbiso, supra*, F049450.) We further explained: "This broad incorporation of reassessment powers would, we believe, necessarily include the reassessment provisions in the Improvement Act of 1911 (as referenced in *Furey* [*v. City of Sacramento* (1979) 24 Cal.3d 862, 873–875 [157 Cal.Rptr. 684, 598 P.2d 844]]) which give discretion to the legislative body to grant reassessments 'to relieve owners' and allow such relief 'at any time before the assessments levied . . . are fully paid and discharged.' (§ 5550; *Furey, supra*, 24 Cal.3d at pp. 873–874.)" (*OPUD v. Galbiso, supra*, F049450.) The parties do not challenge our conclusion that OPUD had discretion to authorize a reassessment of Galbiso's parcels. The sole question presented here is whether OPUD's failure to grant Galbiso's reassessment proposal constituted an abuse of discretion.

As a preliminary matter, we agree with the trial court that traditional mandate under Code of Civil Procedure section 1085 governs, rather than administrative mandate, because the proceeding before the OPUD board of directors was not one in which by law evidence was required to be taken (Code Civ. Proc., § 1094.5, subd. (a)), and because decisions to grant reassessments are predominantly quasi-legislative in nature. (See *Wilson v. Hidden Valley Mun. Water Dist.* (1967) 256 Cal.App.2d 271, 277–281 [63 Cal.Rptr. 889] [traditional mandate applies as to quasi-legislative acts, including a water district's determination of a petition to remove lands from the water district]; *Gordon v. City of Los Angeles* (1944) 63 Cal.App.2d 812, 815–817 [147 P.2d 961] [describing reassessment under Improvement Act of 1911 as discretionary legislative act].)

A writ of mandate will lie "to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station" (Code Civ. Proc., § 1085) in cases "where there is not a plain, speedy, and adequate remedy, in the ordinary course of law" (Code Civ. Proc., § 1086). "Two basic requirements are essential to the issuance of the writ: (1) A clear, present and usually ministerial duty upon the part of the respondent [citations]; and (2) a clear, present and beneficial right in the petitioner to the performance of that duty [citation]. [Citation.]" (*People ex rel. Younger v. County of El Dorado* (1971) 5 Cal.3d 480, 491 [96 Cal.Rptr. 553, 487 P.2d 1193].)

"Although mandate will not lie to control a public agency's discretion, that is to say, force the exercise of discretion in a particular manner, it will lie to correct abuses of discretion. [Citation.] In determining whether an agency has abused its discretion, the court may not substitute its judgment for that of the agency, and if reasonable minds may disagree as to the wisdom of the agency's action, its determination must be upheld. [Citation.]" (*Helena F. v. West Contra Costa Unified School Dist.* (1996) 49 Cal.App.4th 1793, 1799 [57 Cal.Rptr.2d 605].) "The trial court's inquiry in a traditional mandamus proceeding is limited to whether the local agency's action was arbitrary, capricious, or entirely without evidentiary support, and whether it failed to conform to procedures required by law." (*Neighbors in Support of Appropriate Land Use v. County of Tuolumne* (2007) 157 Cal.App.4th 997, 1004 [68 Cal.Rptr.3d 882].)

Here, while the complaint made reference to our holding that OPUD had *discretion* to approve a reassessment, it failed to allege any basis for a *mandatory duty* on the part of OPUD to grant Galbiso's particular reassessment request. The allegations stated as a mere conclusion that "OPUD has abused [its] discretion in failing to grant [Galbiso's] request for reassessment of Parcels 56 and 57 according to agricultural use," but no facts are alleged to support that claim.[5] "In order to state a cause of action warranting judicial interference with the official acts of the administrative body the plaintiff must allege more than mere conclusions of law; it must allege specific facts from which the conclusions entitling it to relief follow." (*California State Psychological Assn. v. County of San Diego* (1983) 148 Cal.App.3d 849, 861

---

[5] Galbiso's request for reassessment was in the form of a proposed resolution No. 2008-05, which was submitted to the OPUD board of directors and placed on the agenda of the May 13, 2008, regular meeting. Recitals in the proposed resolution pointed out our decision that OPUD had discretion to grant reassessment. The substance of the proposed resolution was that Galbiso would be reassessed based on five sewer connections for which she would be credited with payment, and that the liens on parcels 56 and 57 would be released. The remaining 83 connections and assessments would be transferred back to OPUD to be assigned upon consent to other property owners who needed them. Galbiso's reassessment request was apparently part of a global "Road Map Settlement" proposal offered to OPUD.

[198 Cal.Rptr. 1].) Galbiso did not do so here. In particular, her failure to allege a basis for a clear and present duty on the part of OPUD to grant her proposed reassessment request was fatal to her cause of action for a writ of mandate. (Code Civ. Proc., § 1085.) The trial court correctly sustained OPUD's demurrer to the writ of mandate cause of action.

Moreover, since OPUD's decision on whether to grant Galbiso's proposed resolution that OPUD approve particular terms of reassessment (fn. 5, *ante*) was one within OPUD's discretion to make, and no legal basis was (or is) presented for concluding that OPUD was required, as a clear and present duty, to accept *the particular terms proposed*, no possibility for amendment existed for a claim against OPUD premised upon its rejection on May 13, 2008, of that proposed resolution.

IV. *Leave to Amend*

Galbiso contends the trial court abused its discretion in denying leave to amend the complaint. "To prove such abuse of discretion, however, the plaintiff must demonstrate how the complaint can be amended." (*Smith v. State Farm Mutual Automobile Ins. Co., supra*, 93 Cal.App.4th at p. 711.) "While such a showing can be made for the first time to the reviewing court [citation], it must be made." (*Ibid.*) If there is a reasonable possibility that a plaintiff can amend his complaint to cure the defects, leave to amend must be granted. (*Kong v. City of Hawaiian Gardens Redevelopment Agency* (2002) 108 Cal.App.4th 1028, 1041–1042 [134 Cal.Rptr.2d 260].)

Although specific grounds for amendment were not presented to the trial court, Galbiso contends on appeal that under the same general set of operative facts, she could have stated a viable cause of action. In particular, she asserts that the enforcement of the special assessment against her parcels may be enjoined, and/or that reassessment thereof may be required, on the basis of her purported "due process" and Proposition 218 claims. We now explore these contentions.

A. *Due Process*

We begin with Galbiso's contention that she can successfully allege what she refers to as a due process claim. What she means by this is unclear, although a brief reference is made to the Supreme Court case of *Furey v. City of Sacramento, supra*, 24 Cal.3d 862 (*Furey*). To place this matter in its proper context, it is important to recall that we previously addressed the issue of whether such a claim was tenable in our opinion in *OPUD v. Galbiso, supra*, F049450, where it was contended by Galbiso that reassessment or other relief was equitably and/or constitutionally required, even after the

initial statute of limitations for challenging the assessment expired, based on the *Furey* case. (See *OPUD v. Galbiso, supra,* F049450.)

In *Furey*, the plaintiffs were property owners who sought relief because a land use ordinance that severely restricted use of their property meant that prior sewer improvements for which they paid assessments would no longer benefit their land. The Supreme Court held that under the circumstances alleged, in which subsequent government action (i.e., the land use ordinance) rendered the prior sewer assessments constitutionally infirm (i.e., the benefit to the plaintiffs' land of the assessed improvements could no longer be realized), appropriate relief would have to be granted to the property owners on equitable and constitutional grounds. (*Furey, supra,* 24 Cal.3d at pp. 866–878.) Accordingly, the defendant public entity would either have to exempt the plaintiffs' parcels from the new land use ordinance or, alternatively, grant a reassessment. (*Id.* at pp. 873–875.) Acknowledging that reassessment was ordinarily discretionary, the Supreme Court also considered that a land use regulation may not be applied to one otherwise subject to it if to do so would result in a taking of property without just compensation. (*Id.* at p. 874.) Additionally, under the circumstances of that case, the Supreme Court held that the 30-day statute of limitations for challenging the original assessment could not be raised as a bar to the plaintiffs' claims. (*Id.* at pp. 876–877.)

In *OPUD v. Galbiso, supra,* F049450, Galbiso argued that under the principles set forth in *Furey*, or based on a reasonable extension thereof, OPUD was required to grant a reassessment as to parcels 56 and 57. Specifically, Galbiso claimed therein that "changed circumstances" had occurred which substantially altered the relationship between the original assessment and the special benefit to her property. These alleged changed circumstances were (1) the original assessment for 88 sewer connections was based on a proposed development by the original landowner that never materialized; (2) Galbiso used the property for farming and needed only one or two sewer connections; and (3) there was a significant waiting list for sewer connections based on a lack of sewer treatment capacity, therefore it was doubtful that OPUD could have supplied 88 sewer connections. (*OPUD v. Galbiso, supra,* F049450.) For reasons explained more fully in our opinion in that case, we concluded that *Furey* was distinguishable, and consequently OPUD was not required to grant a reassessment or take other corrective action. (*OPUD v. Galbiso, supra,* F049450.)

In the present case, Galbiso argues that *new facts* have emerged since the time of the trial and notice of appeal of the foreclosure action in *OPUD v. Galbiso, supra,* F049450, and said new facts reflect that a cause of action may now be stated. The alleged new developments included the following:

(1) The discovery in October of 2006 of maps that were allegedly concealed by OPUD until after the trial in the foreclosure action, which maps allegedly prove that the sewer lines were not moved any closer to Galbiso's property, the connection distance was not decreased, and no special benefit was provided to her parcels, all in direct contradiction to the testimony of OPUD's engineer (upon which the trial court relied in the foreclosure action); (2) the testimony of OPUD's engineer was false and the falsity was suborned by Attorney Sullivan; (3) during 2006, Attorney Sullivan allegedly instructed OPUD employees not to allow Galbiso access to public records regarding the sewer improvements, in violation of the Public Records Act; (4) there remains to this day a waiting list for sewer connections, and OPUD records show that people seeking sewer connections in 2005 were still on the waiting list in 2008 (raising the question of whether 88 connections were ever available); (5) our decision in *OPUD v. Galbiso, supra*, F049450, explained that OPUD *did* have discretion to grant a reassessment; thus Attorney Sullivan's prior insistence (as OPUD's attorney) that the assessment was final and that OPUD could not grant any relief was allegedly a misrepresentation of the law.

Aside from the concealment allegations and the discovery of maps, these are essentially the same allegations that were raised in the foreclosure action. In that appeal, we affirmed the trial court's holding that the statute of limitations barred challenges to the validity of the assessments. (*OPUD v. Galbiso, supra*, F049450.)[6] The concealment allegations in Galbiso's present complaint are serious, and presumably are made in an attempt to plead facts of extrinsic fraud to reopen the judgment in the foreclosure action. Yet that effort must fail unless a basis for a viable cause of action is presented.

Although the new facts alleged by Galbiso are (if true) egregious, we fail to see how they bring this case within the scope of the cause of action in *Furey, supra*, 24 Cal.3d 862. In *Furey*, after the expiration of the statute of limitations to challenge the assessment, the government entity passed a land use ordinance that prevented the property owners in the sewer assessment district from ever using the special benefits of the sewer improvements for which they were assessed. Here, it seems to us, Galbiso is not alleging that OPUD subsequently interfered with her ability to enjoy the special benefits of the improvements. Rather, she is alleging that OPUD had all along failed to comply with the law governing special assessments—i.e., the law that an assessed parcel must specially benefit from the improvement and the assessment must be proportional to the special benefit to that parcel. This was the type of challenge that was found to be barred by the statute of limitations in

---

[6] We also affirmed, based on substantial evidence, the trial court's declaratory relief determination that the assessments did specially benefit Galbiso's parcels. (*OPUD v. Galbiso, supra*, F049450.)

*OPUD v. Galbiso, supra*, F049450. The alleged maps arguably constitute some evidence of OPUD's alleged noncompliance with these standards, but that does not transform the cause of action into a due process claim analogous to the claim in *Furey*. We conclude that Galbiso has failed to meet her burden of showing that such a due process cause of action existed in her favor.

### B. *Proposition 218*

Finally, Galbiso argues that leave to amend should have been granted to state a cause of action under Proposition 218. OPUD counters that Proposition 218 does not apply because the subject assessment predated the passage of Proposition 218 and was "grandfathered in" under a provision exempting certain types of preexisting assessments. We begin with a brief look at that constitutional provision.

On November 5, 1996, California voters passed Proposition 218 as a constitutional amendment regarding special assessments. (Cal. Const., art. XIII D.) "Proposition 218 limited local government's ability to impose real property assessments in two significant ways. An assessment can be imposed only for a 'special benefit' conferred on real property [citation], and the assessment on any parcel must be in proportion to the special benefit conferred on the particular parcel [citation]." (*Silicon Valley Taxpayers' Assn., Inc. v. Santa Clara County Open Space Authority* (2008) 44 Cal.4th 431, 437 [79 Cal.Rptr.3d 312, 187 P.3d 37], fn. omitted (*Silicon Valley*).) That is, in addition to providing strict procedural requirements for passage of a special assessment, Proposition 218 imposed substantive requirements that significantly tightened the legal definitions of the two key elements necessary to support a valid assessment: special benefits and proportionality. (*Silicon Valley, supra*, at pp. 443, 447–457.) These substantive requirements are contained in article XIII D, section 4, subdivision (a) of the California Constitution, which provision states in part as follows: "An agency which proposes to levy an assessment shall identify all parcels which will have a special benefit conferred upon them and upon which an assessment will be imposed. The proportionate special benefit derived by each identified parcel shall be determined in relationship to the entirety of the capital cost of a public improvement, the maintenance and operation expenses of a public improvement, or the cost of the property related service being provided. No assessment shall be imposed on any parcel which exceeds the reasonable cost of the proportional special benefit conferred on that parcel. Only special benefits are assessable, and an agency shall separate the general benefits from the special benefits conferred on a parcel."

Additionally, Proposition 218 changed prior law with respect to the burden of proof in a legal action contesting the validity of an assessment. In such an action, "the burden shall be on the agency to demonstrate that the property or properties in question receive a special benefit over and above the

benefits conferred on the public at large and that the amount of any contested assessment is proportional to, and no greater than, the benefits conferred on the property or properties in question." (Cal. Const., art. XIII D, § 4, subd. (f).)

The key question we must answer is whether Proposition 218 is applicable to the assessment under consideration in the present case. Section 5 of article XIII D of the California Constitution states, in relevant part: "[T]he provisions of this article shall become effective the day after the election unless otherwise provided. Beginning July 1, 1997, all existing, new, or increased assessments shall comply with this article." (Cal. Const., art. XIII D, § 5, (Section 5).) Section 5 then goes on to state the following exemption for preexisting assessments: "Notwithstanding the foregoing, the following assessments existing on the effective date of this article shall be exempt from the procedures and approval process set forth in Section 4: [¶] (a) Any assessment imposed exclusively to finance the capital costs or maintenance and operation expenses for sidewalks, streets, *sewers*, water, flood control, drainage systems or vector control." (§ 5, subd. (a), italics added.)

The import of section 5 is that, "[i]n general, an assessment already in existence on the effective date of Proposition 218 (preexisting assessment) must comply with Proposition 218 by July 1, 1997" (*Howard Jarvis Taxpayers Assn. v. City of Riverside* (1999) 73 Cal.App.4th 679, 682 [86 Cal.Rptr.2d 592]), except that certain types of preexisting assessments, including (as here) preexisting sewer assessments, would have the benefit of the exemption. (*Ibid.*)

In the present case, to the extent that the assessment was officially levied in 1995 as we previously held in *OPUD v. Galbiso, supra*, F049450, it was a preexisting sewer assessment to which the exemption would apply. Galbiso now disagrees, asserting that the effective date of the assessment was in reality *after* the passage of Proposition 218 because the amount of the assessment was allegedly not finalized until 2001. Her argument fails to show a basis for leave to amend because the date of *levy* of an assessment—which is when an assessment has legal existence—is defined by statute pursuant to section 10312, subdivision (a), as the date on which the legislative body adopts the resolution confirming the report and assessment and orders the work to be performed. (*Fahey v. City Council* (1962) 208 Cal.App.2d 667, 676–679 [25 Cal.Rptr. 314].) Galbiso has not alleged a factual basis to indicate that these events happened subsequent to the passage of Proposition 218. There was admittedly an adjustment (i.e., a reduction) in the assessment that occurred in 2001 (see *OPUD v. Galbiso, supra*, F049450), but we fail to see how that changes the effective date of the assessment itself. (See

*Schuetram v. Granada Sanitary Dist., supra*, 229 Cal.App.2d at pp. 31–32 [subsequent modification did not extend period for challenging assessment].) We conclude that Galbiso failed to show that she has a viable cause of action under Proposition 218, and no further basis for leave to amend was presented.

## DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to OPUD.

Wiseman, Acting P. J., and Dawson, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 23, 2010, S181840.