Filed 8/28/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| SOLANO COUNTY ORDERLY GROWTH COMMITTEE,<br>        Plaintiff and Respondent,<br>v.<br>CITY OF FAIRFIELD,<br>        Defendant and Appellant;<br>COUNTY OF SOLANO,<br>        Real Party in Interest. | A170680<br><br>(Solano County<br>Super. Ct. No. FCS059198) |
| SOLANO COUNTY ORDERLY GROWTH COMMITTEE,<br>        Plaintiff and Respondent,<br>v.<br>CITY OF FAIRFIELD,<br>        Defendant;<br>COUNTY OF SOLANO,<br>        Real Party in Interest and Appellant. | A170739<br><br>(Solano County<br>Super. Ct. No. FCS059198) |

At the request of the County of Solano, in 2022 the City of Fairfield and the Solano Irrigation District entered into an agreement by which the City would receive "raw water" from the District, treat the water at existing City facilities, and supply the District with an equivalent amount of potable water

1

for use in a new mixed-use development that had been approved by the County in an unincorporated area known as Middle Green Valley, just outside the Fairfield city limits. The City would simply treat water provided by the District and make it potable; the District would do the rest, including distribution, operations, maintenance, and billing, and would bear all costs associated with serving the potable water. In written materials prepared before the Fairfield City Council voted on the resolution authorizing the City to enter into the agreement, the City stated that it had the right to serve water as a wholesaler for use outside the City's boundaries, that entering the agreement was consistent with the City's current practice, and that the agreement was modeled on an existing water treatment agreement between the City and the District.

After the resolution was passed and the potable water service agreement was signed, Solano County Organized Growth Committee, an unincorporated association, filed a petition for writ of mandate in Solano County Superior Court seeking to invalidate it. The Committee alleged that the City's approval of the agreement conflicted with an express policy in the City's 2002 General Plan and therefore violated California's Planning and Zoning Law (Gov. Code, § 65000 et seq). The trial court granted the petition and judgment was entered in favor of the Committee. The effect of this was to invalidate the agreement.

In this appeal, the City and the County argue that California law does not require the potable water service agreement to be consistent with the City's General Plan. They further argue that even if the law does so require, the City reasonably determined that the approval and agreement were consistent with the General Plan, and that interpreting the General Plan to

prohibit the City's approval of the agreement would infringe the City's constitutional authority to provide water outside its boundary.

We are not persuaded that the law requires the agreement to be consistent with the City's General Plan. However, assuming that the law does so require, we conclude that the City's determination of consistency was reasonable. Therefore we reverse the trial court judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Background on the Planning and Zoning Law*

The Planning and Zoning Law requires each county and city to "adopt a comprehensive, long-term general plan for the physical development of the county or city, and of any land outside its boundaries which in the planning agency's judgment bears relation to its planning." (Gov. Code, § 65300; further statutory references are to the Government Code.) A general plan "consist[s] of a statement of development policies . . . setting forth objectives, principles, standards, and plan proposals." (§ 65302.) A general plan must address various "elements," including land use, housing, conservation, and open-space. (§§ 65301, subd. (c); 65302, subds. (a), (c), (d), (e).) Once adopted, a general plan may be amended by the city or county's legislative body "[i]f it deems it to be in the public interest" (§ 65358, subd. (a)) pursuant to procedures set forth in sections 65350 through 65362, or by initiative. (*DeVita v. County of Napa* (1995) 9 Cal.4th 763, 775 (*DeVita*).)

The role of the general plan is reflected in the Legislature's finding that "decisions involving the future growth of the state, most of which are made and will continue to be made at the local level, should be guided by an effective planning process, including the local general plan." (§ 65030.1) The Government Code requires that certain specified actions and decisions be "consistent" with the general plan, including the adoption or amendment of a

3

"specific plan" (§ 65454), actions affecting interests in open-space land (§§ 65560, subd. (g), 65566), zoning ordinances (§ 65860, subd. (a)), development agreements (§ 65867.5, subd. (b)), and proposed subdivision maps and parcel maps (§§ 66473.5, 66474, subd. (a)).

Our Supreme Court has explained that " 'the requirement of consistency . . . infuse[s] the concept of planned growth with the force of law.' " (*Orange Citizens for Parks & Recreation v. Superior Court* (2016) 2 Cal.5th 141, 153 (*Orange Citizens*).) " ' "An action, program, or project is consistent with the general plan if, considering all its aspects, it will further the objectives and policies of the general plan and not obstruct their attainment." ' " (*Ibid.*, citing Governor's Office of Planning & Research, General Plan Guidelines (2003).)

B.     *The City of Fairfield's General Plan*

The City's General Plan, adopted in 2002, includes a Land Use Element that identifies two goals:  "Preserve and enhance the City's desired physical character with well-balanced patterns of growth and development" and "Create safe and viable neighborhoods with wide ranges of choices, services, and amenities."  In furtherance of those goals, the Land Use Element sets forth several objectives, including Objective LU 3: "Establish an urban limit line that allows development to be satisfactorily planned before it occurs."  As shown in the Land Use Diagram in the General Plan, the urban limit line coincides with the City boundary in many places, but in others lies outside or inside the City limits.

The focus of this litigation is Policy LU 3.1, which was adopted to further Objective LU 3.  Policy LU 3.1 provides:  *What is urban shall be municipal, and what is rural shall be within the County.  Any urban development requiring basic municipal services shall occur only within the*

4

*incorporated City and within the urban limit line established by the General*

*Plan.*"  (Italics added.)  The General Plan does not define "urban

development" or "basic municipal services."[1]

C.      *The Challenged Agreement*

The agreement at issue in this appeal is formally entitled, "Agreement

for Potable Water Service Between the City of Fairfield and the Solano

Irrigation District for the Middle Green Valley Specific Plan Area"

(Agreement).  The sole purpose of the Agreement is for the City to treat water

supplied by the Solano Irrigation District so that the District can provide

potable water to the Middle Green Valley Project in unincorporated Solano

County, just north of the City boundaries and outside the City's urban limit

line, in an area where the District currently provides non-potable water.

Years before the Agreement was drafted, the County adopted its own

general plan and approved the "Middle Green Valley Specific Plan," which, as

described in the record, calls for a mix of land uses, including residential

units, agricultural tourism, local retail and community facility uses, with

---

[1] The two sentences comprising Policy LU 3.1, which we have italicized
in the main text, appear verbatim in two other General Plan policies; the
three policies are linked by cross references.  In the Open Space,
Conservation and Recreation Element, the goal of which is to "[d]esignate,
preserve, and protect agricultural, ecological, recreational and scenic lands in
Fairfield and surrounding areas for now and future generations," the
language appears in a policy intended to further the objective "Support
preservation of existing agricultural lands."  And in the Agriculture Element,
the goals of which are to "[p]reserve agricultural and grazing lands within the
General Plan Area [i.e., the lands designated on the Land Use Diagram]
which define the visual setting of Fairfield" and to "[r]ecognize the economic
importance of agriculture in Solano County by directing the City's growth
away from important farmlands and prime agricultural soils," the language
appears in a policy intended to further the same objective:  "Support
preservation of existing agricultural lands."

1,490 acres, or 78 percent of Middle Green Valley, preserved for agriculture and open space in large tracts. The Middle Green Valley Project itself consists of about 250 acres of mixed-use development, including 400 new primary residential units in four neighborhoods, with agricultural tourism, community buildings, and retail, as well as 100 secondary residential units and farmworker housing.

Under the Agreement, the City would receive raw water from the Solano Irrigation District, treat the water to potable standards at the City's existing water treatment facilities, and convey an equivalent quantity of treated water to the District at connection points at the City's western boundary.

D.    *Approval of the Water Treatment Agreement*

In 2021, the County made a formal request that the City work with the District to execute an agreement by which the City would accept raw water from the District, treat it, and deliver it back to the District, which would provide water service throughout the Project, including distribution, operations, maintenance, and billing. The County reported that the Middle Green Valley Specific Plan, which includes the area where the Project would be developed, had "received all necessary approvals, including a certified Environmental Impact Report that included an alternative analyzing [District] supplied water to be treated by the City of Fairfield. Our understanding is pipeline infrastructure is largely in place to facilitate delivery of water to the [P]roject."

The City Council authorized staff to negotiate an agreement with the District; negotiations proceeded; and in May 2022 the District authorized the execution of an agreement with the City that was modeled on a 2002 agreement between the City and the District under which the City treated

6

water provided by the District for use in the Blue Ridge Oaks unincorporated area. One of the recitals in the Agreement states that the City "has the right to serve water as a wholesaler to portions outside the City's annexed boundary." Another recital states, "[T]his agreement is a treat-and-wheel agreement and does not constitute a basic service (i.e., [the District] is providing the basic services pertaining to distribution, billing, maintenance and repairs)."[2]

City staff prepared a report recommending that the City Council adopt a resolution authorizing the execution of the Agreement. The report stated that the City's water supply would not be needed to meet the water demands for the Middle Green Valley Project, which had received all necessary approvals; that the Agreement followed the form and structure of an existing agreement with the District by which the City received raw water from the District, treated it, and delivered treated water to the District for the District to serve to an unincorporated area of the county, with the District paying for the service provided by the City; that the City has the right to serve water as a wholesaler to areas outside its boundaries; and that "choosing not to [execute the agreement] would be inconsistent with current practice."

---

[2] "Treat-and-wheel" is a term of art; in this context, "wheel" means "transport." (See *San Diego Water Authority v. Metropolitan Water Dist. of Southern California* (2017) 12 Cal.App.5th 1124, 1135 [" '[w]heeling' is the industry term for '[t]he use of a water conveyance facility by someone other than the owner or operator to transport water' "].) Under the Agreement, the District would receive the treated water at connection points at the City's boundary; use District-operated and -maintained distribution lines to provide potable water to end users within the Middle Green Valley Project; and bill the customers. The District would reimburse the City for the cost of constructing the connections at which water would be transferred between the District and the City, and would pay the City connection charges as well as monthly volume and service charges for the water.

The Committee submitted written objections to the City, arguing that the Agreement was inconsistent with General Plan Policy LU 3.1, which, according to the Committee, "precludes the City from providing municipal services, including water treatment services, for development outside of the City's urban limit line." The Committee stated that "providing treated water from the City of Fairfield's system is clearly a municipal service."

The City Council adopted the resolution and the Agreement was subsequently executed.

E.    *Proceedings in the Trial Court*

The Committee filed a verified petition for writ of mandate and complaint for injunctive relief against the City, naming the District and the County as real parties in interest. The Committee sought writs of mandate directing the City to vacate and set aside its approval of the resolution and Agreement, as well as a declaration that the resolution and Agreement are inconsistent with the City's general plan and that the City may not provide the services specified in the Agreement.

The Committee alleged a single cause of action entitled "Violations of State Planning and Zoning Law." To support its cause of action, the Committee alleged that the Agreement is a City decision "affecting land use development and therefore must be consistent with the General Plan"; that General Plan Policy LU 3.1 "prohibits the City from providing basic municipal services (including treated water) for development outside the City's urban limit line"; that the approval of the resolution and Agreement is inconsistent with the General Plan because it would obligate the City to provide basic municipal services for development outside the urban limit line; that the City violated state law by approving the Agreement because the approval is not consistent with the general plan; that "[a]s a result of this

8

violation, the City prejudicially abused its discretion by approving" the Agreement; and that the approval must be set aside.

The Committee's claims were resolved through a motion for judgment on the writ and complaint filed by the Committee. After briefing and a hearing, the trial court granted the motion; judgment was entered for the Committee; and a peremptory writ of mandate was entered.

The City timely appealed (case No. A170680), as did the County (case No. A170739).[3] We ordered the cases consolidated.[4]

## DISCUSSION

A.    *Whether State Law Requires Approval of the Agreement to Be Consistent with the General Plan*

This appeal presents the threshold question whether California law requires the City's approval of the Agreement, which authorizes it to treat water provided by the District in exchange for payment, to be consistent with the City's General Plan. We agree with the parties that this is a purely legal issue that we review de novo. (See *20th Century Ins. Co. v. Garamendi* (1994) 8 Cal.4th 216, 271 [" '[q]uestions of law relate to the selection of a rule; their resolution is reviewed independently' "].)

---

[3] Appellant County did not participate in the proceedings below. The District, an independent special district government agency, participated below but is not a party to this appeal.

[4] In connection with its respondent's brief, the Committee requests we take judicial notice of the updated "Public Facilities and Services Element" of the City's General Plan. The update was adopted by the City in December 2024, months after the trial court judgment from which this appeal has been taken. We deferred ruling on the request, and now deny it on the ground that the document is not "necessary, helpful, or relevant" to the resolution of this appeal. (*Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison* (1998) 18 Cal.4th 739, 748, fn. 6.)

1. *No Statutory Requirement*

The Committee argues that the City's approval of the Agreement was correctly vacated by the trial court because the approval is a " ' "decision affecting land use" ' " (*Orange Citizens*, *supra*, 2 Cal.5th at p. 153) and is inconsistent with General Plan Policy LU 1.3, which the Committee reads as restraining the City's ability to treat water for use in the Project. The parties appear to agree there is no statute or ordinance that specifically requires the City's approval of the Agreement to be consistent with the City's General Plan. In particular, the Committee does not contend that the approval of the Agreement is an adoption or amendment of a specific plan (§ 65454), an action affecting interests in open-space land (§§ 65560, 65566), a zoning ordinance (§ 65680), development agreement (§ 65867.5), or subdivision map or parcel map (§ 66473.5, 66474)—each of which is specified in the Planning and Zoning Law as an action or decision requiring consistency.

2. *No Clear Requirement in Case Law*

The Committee argues that even in the absence of a statutory requirement of consistency, well-established case law requires that "all local decisions affecting land use must be consistent with the jurisdiction's applicable general plan."[5] This is a questionable assertion in the context of this appeal. The City's decision to approve the Agreement will certainly have an effect on land use, as reflected in the recital in the Agreement stating that the water the City will be treating "is necessary for the development of the [Project]." But the mere fact that this decision will have an effect on land use does not mean that it must be consistent with the City's General Plan, as we will discuss. The Committee reads the cases on which it relies too broadly.

---

[5] In this and other quotations from the Committee's brief, we omit the boldface italics used by the Committee for emphasis.

10

a. *Orange Citizens*

In contending that "Courts have long recognized that 'any' decision a city makes that 'affect[s] land use and development' must be consistent with the applicable policies in the city's General Plan," the Committee's brief quotes from *Orange Citizens*. (See *Orange Citizens*, *supra*, 2 Cal.5th at p. 153.) The quoted excerpts omit crucial context as well as relevant citations. *Orange Citizens* concerned claims that the City of Orange abused its discretion in determining that a zoning change and a development agreement were consistent with its general plan. (*Id.* at pp. 154-155.) Contrary to the Committee's suggestion, *Orange Citizens* did not hold that "every decision the City makes 'affecting land use' must be consistent with the applicable policies in its General Plan" and did not purport to expand the range of decisions that must be consistent with a general plan beyond those enumerated in the Planning and Zoning Law.

The passage in *Orange Citizens* from which the language is drawn is part of a background discussion of the law governing general plans. (*Orange Citizens*, *supra*, 2 Cal.5th at pp. 152-154.) Our Supreme Court explained: "Until 1971, the general plan was ' "just an 'interesting study,' " ' which did not bind local land use decisions. (*deBottari v. City Council* (1985) 171 Cal.App.3d 1204, 1211 (*deBottari*).) But now ' "[t]he propriety of virtually any local decision affecting land use and development depends upon consistency with the applicable general plan and its elements." ' ([*Citizens of*] *Goleta Valley* [*v. Board of Supervisors* (1990)] 52 Cal.3d [553,] 570 [(*Goleta Valley*)], quoting *Resource Defense Fund v. County of Santa Cruz* (1982) 133 Cal.App.3d 800, 806 [(*Resource Defense Fund*)]; see §§ 65359 [requiring that specific plans be consistent with the general plan], 66473.5 [same with respect to tentative maps and parcel maps], 65860 [same with respect to

11

zoning ordinances], 65867.5, subd. (b) [same with respect to development agreements].)" (*Orange Citizens*, *supra*, 2 Cal.5th at p. 153.) By including citations to specific sections of the Planning and Zoning Law, our Supreme Court identifies the type of "local decision affecting land use and development" that must be consistent with a general plan.[6]

Neither *Orange Citizens* nor the cases cited in the passage from *Orange Citizens* on which the Committee relies expand the range of decisions that must be consistent with a general plan beyond those identified in the Planning and Zoning Law itself. Thus, *Goleta Valley*, *supra*, 52 Cal.3d at pages 572-573, discusses the relationship between the analyses underlying environmental impact reports and general plans, and cites *Resource Defense Fund* and *deBottari* for the proposition that "the keystone of regional planning is consistency—between the general plan, its internal elements, subordinate ordinances, and all derivative land-use decisions." (*Goleta Valley* at pp. 572-573.) *Resource Defense Fund* states that "[u]nder state law, the propriety of virtually any local decision affecting land use and development depends upon consistency with the applicable general plan and its elements"; that "[i]n particular, any action affecting open-space land must be consistent with the local open-space plan (§§ 65563, 65566, 65567; *Save El Toro Assn. v. Days* (1977) 74 Cal.App.3d 64); local zoning ordinances must be consistent with the general plan (§ 65860); and approvals pursuant to the Subdivision

---

[6] In certain circumstances that do not apply in this case, consistency with the general plan may be required by state or local law other than the statutes in the Planning and Zoning Law. For example, as discussed in *United Neighborhoods for Los Angeles v. City of Los Angeles* (2023) 93 Cal.App.5th 1074, the so-called "in-fill" exemption from review under the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.) applies only to projects that are "consistent with 'all applicable general plan policies.'" (*Id.* at pp. 1080-1081.)

12

Map Act (§ 66410 et seq.) must be consistent with the general plan (§ 66473.5, 66474)"; and that in addition a Santa Cruz County ordinance required consistency with the general plan for tentative maps. (*Resource Defense Fund*, *supra*, 133 Cal.App.3d at p. 806.) And *deBottari* notes that consistency with the general plan is required for proposed subdivisions under section 66473.5 and for zoning ordinances under section 65860. (*deBottari*, *supra*, 171 Cal.App.3d at pp. 1210-1211.)

> b. *Other Cases Discussing the Need for Consistency Between Land Use Decisions and a General Plan*

Like *Orange Citizens*, the other two cases on which the Committee relies for support of its contention that any decision that affects land use and development must be consistent with the general plan are more limited in scope than the Committee suggests.

The Committee cites *DeVita*, which concerned the propriety of amending a general plan by an initiative of the electorate. (*DeVita*, *supra*, 9 Cal.4th at pp. 770-771.) In discussing the statutory framework of the Planning and Zoning Law, the Supreme Court wrote that "after 1971 the general plan truly became, and today remains a ' "constitution" for future development' (*Lesher Communications, Inc. v. City of Walnut Creek* (1990) 52 Cal.3d 531, 540 (*Lesher Communications*)) located at the top of the 'hierarchy of local government law regulating land use' (*Neighborhood Action Group v. County of Calaveras* (1984) 156 Cal.App.3d 1176, 1183 [(*Neighborhood Action Group*)].)" (*DeVita*, *supra*, 9 Cal.4th at p. 772-773.) The general plan, according to DeVita, is "a master plan to guide future land use decisions." (*Id.* at p. 773.)

Neither *DeVita* nor the cases that it cites hold that all decisions that arguably affect land use and development must be consistent with the applicable general plan. *Lesher Communications* concerns the consistency

13

requirement for zoning ordinances. (*Lesher Communications*, *supra*, 52 Cal.3d at pp. 540-541.)  In considering whether a general plan can be amended by initiative, the Supreme Court in *Lesher Communications* stated, "We cannot at once accept the function of a general plan as a 'constitution,' or perhaps more accurately a charter for future development, and the proposition that it can be amended without notice to the electorate that such amendment is the purpose of an initiative." (*Ibid.*)  *Neighborhood Action Group* held that conditional use permits must be consistent with the general plan because they derive from zoning law, which must be consistent with the general plan.  (*Neighborhood Action Group*, *supra*, 156 Cal.App.3d at p. 1184 [conditional use permits must be consistent with general plan because "a use permit is struck from the mold of the zoning law (§ 65901); the zoning law must comply with the adopted general plan (§ 65860); the adopted general plan must conform with state law (§§ 65300, 65302).  The validity of the permit process derives from compliance with this hierarchy of planning laws"].)

In addition to *Orange Citizens* and *DeVita*, the Committee relies on *Friends of "B" Street v. City of Hayward* (1980) 106 Cal.App.3d 988 (*"B" Street*).  *"B" Street* relied on the Legislature's finding in section 65030.1 that " 'decisions involving the future growth of the state, most of which are made and will continue to be made at the local level, should be guided by an effective planning process, including the local general plan,' " to conclude that a city's decisions "to proceed with public works projects" are subject to an "implied statutory requirement of consistency" and therefore must conform to the general plan.  (*Id.* at p. 998.)  *"B" Street* is unlike the case before us, which concerns an agreement to provide treated water for use in an area outside city limits, rather than a public works projects within a city's

14

boundaries. The project at issue in *"B" Street* was a proposed public works street improvement project within the City of Hayward that involved among other things the construction of a bridge; the removal of grass, garden areas, vegetation, landscaping, shrubs, hedgerows and 153 mature trees; the removal of two neighborhood stores; and the displacement of 12 families. (*Id.* at p. 1003.) The project was alleged to be inconsistent with the city's general plan, which itself was alleged to lack the "noise" element that was required by statute. (*Id.* at pp. 992, 996, 997.) The Court of Appeal held that even though no statute required consistency between the public works project and the general plan, the trial court could grant injunctive relief on the basis of inconsistency of the project with the city's general plan, as well as on the basis of the lack of a required element in the plan. (*Id.* at pp. 998-999.)

As the Court of Appeal observed in *"B" Street*, the Legislature did not limit the policy stated in section 65030.1, that " 'decisions involving the future growth of the state . . . should be guided by an effective planning process, including the local general plan,' " to private developments. (*"B" Street, supra,* 106 Cal.App.3d at p. 998.) But that policy does not constitute a legislative mandate that every decision made by a city or county that in some way involves the future growth of the state must be consistent with the general plan. Much like the consistency requirements that are specified in sections of the Planning and Zoning Law, the consistency requirement imposed by *"B" Street* on public works projects concerns a decision about how land would be used within the boundaries of the city that had adopted the general plan at issue. We decline to extend *"B" Street* to apply to the City's decision to approve the use of City facilities to treat water for a proposed development that is outside the City's borders in unincorporated Solano County and that the County had decided to approve. And we note that,

15

contrary to the Committee's suggestion, *"B" Street* does not stand for the proposition that "[a]ny City decisions concerning changes to the use of its own 'public works' must be consistent with" the City's General Plan.

The Committee argues that although the Project is outside the City's borders, it lies within the area identified by the City as bearing on its planning. (See § 65300 [in addition to addressing the physical development of the city itself, a city's general plan may address the physical development "of any land outside its boundaries which in the planning agency's judgment bears relation to its planning"].) That does not change the fact that only certain of the actions taken by a city or county are required by the Planning and Zoning Law to be consistent with the applicable general plan. Nor does it change the fact that the City's approval of the Agreement to treat water provided by the District is not a decision to proceed with a major public works project within the City limits and therefore is unlike the decision at issue in *"B" Street*. The City's approval of the Agreement may have an effect on land use, but it is not a "land use decision" that must be consistent with the City's General Plan. (See *Friends of Lagoon Valley v. City of Vacaville* (2007) 154 Cal.App.4th 807, 815 [explaining that "a city's *land use decisions* must be consistent with the policies expressed in the general plan" (italics added), discussing requirement of consistency between development project and general plan under Subdivision Map Act (§ 66473.5)] (*Lagoon Valley*).)

c.     *Cases Concerning Decisions to Deny Services*

The Committee cites two cases in which Courts of Appeal have recognized that cities may adopt policies concerning water services— specifically, water and sewer hookups—that are expressly intended to influence development outside their boundaries, and have upheld cities' decisions to deny services based on those policies: *Dateline Builders, Inc. v.*

16

*City of Santa Rosa* (1983) 146 Cal.App.3d 520 (*Dateline Builders*) and *County of Del Norte v. City of Crescent City* (1999) 71 Cal.App.4th 965 (*Del Norte*). Neither case holds that an action like the City's in approving the Agreement here must be consistent with the City's General Plan.

In *Dateline Builders*, a city adopted a policy that proposed development be consistent with the city and county joint general plan and a procedure requiring a developer to obtain a certificate of compliance with the city's development standards as a condition of the extension of sewer service outside the city. (*Dateline Builders, supra,* 146 Cal.App.3d at pp. 523-524.) The city denied a certificate of compliance for a proposed development in an agricultural area that was "well beyond" the city's boundaries on the grounds that the development was " 'leap-frog' development" and therefore in conflict with the general plan and the development policies and standards for compact development. (*Id.* at pp. 524-525.) The developer filed suit and appealed from the judgment entered for the city. (*Id.* at p. 523.) The Court of Appeal affirmed, rejecting the developer's arguments that the city's refusal to grant the certificate was arbitrary and therefore unlawful and that the city could not use sewer hookups as a planning tool. (*Id.* at pp. 526, 529.) The court held that the city reasonably exercised its police power in denying the certificate on the grounds that the proposed development was not consistent with the policy set forth in the general plan. (*Id.* at p. 523.) The Committee notes that the Court of Appeal in *Dateline Builders* wrote that the denial of the certificate in that case was "a necessary and proper exercise of the power" in light of the general plan. (*Id.* at p. 531.) But that does not mean that it was "necessary" for the City of Fairfield to determine whether the Agreement here was consistent with its general plan. The city in *Dateline Builders* had established policies and procedures to ensure that sewer service would be

17

extended to new development only if the development was consistent with the general plan, and the Court of Appeal held that the city had the authority to establish such a policy. (*Id.* at pp. 524, 531-532.) Here, however, no City policy or procedure requires that the approval of contracts for water treatment be consistent with the general plan.

*Del Norte* stands for the proposition that a city has the discretion to adopt a policy confining new water hookups to property within its borders, so long as the policy is neither arbitrary or unreasonable. (*Del Norte, supra,* 71 Cal.App.4th at p. 973.) In *Del Norte*, a city that provided water and sewer connections in unincorporated areas of the county as well as within the city, enacted a policy that it would no longer allow new utility connections outside its own incorporated territory. (*Id.* at pp. 968-969.) The county filed suit; the trial court concluded the city's policy was arbitrary and granted the county the relief it requested. (*Id.* at p. 968.) The Court of Appeal reversed, based on its conclusion that the city's policy was neither arbitrary nor unreasonable in the circumstances, which included the city facing potential sanctions from the Regional Water Quality Control Board arising from issues associated with the city's wastewater system, a proposed multimillion dollar upgrade to the water system to benefit existing users, and the county's elimination of the city's financial incentives to provide utilities in areas that competed with city businesses. (*Id.* at pp. 968, 976-978.) *Del Norte* holds that public utilities may be used as a tool to manage growth (*id.* at p. 977), but says nothing about the need for consistency between a city's general plan and a decision to provide utility connections.

In short, we are not convinced that California law requires the City's approval of the potable water services agreement to be consistent with the City's General Plan. We will assume for the sake of argument, however, that

consistency with the General Plan is required by law.  Even so, we will reverse.

B.      *Whether Approval of the Agreement is Consistent with the General Plan*

　　　　1.      *Applicable Law and Standard of Review*

As our Supreme Court has stated, " ' "An action, program, or project is consistent with the general plan if, considering all its aspects, it will further the objectives and policies of the general plan and not obstruct their attainment." ' " (*Orange Citizens*, *supra*, 2 Cal.5th at p. 153.)  Conversely, a project is inconsistent with the general plan if it "frustrate[s] the general plan's goals and policies" (*Napa Citizens for Honest Government v. Napa County Board of Supervisors* (2001) 91 Cal.App.4th 342, 378) or "if it conflicts with a general plan policy that is fundamental, mandatory, and clear." (*Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 782 (*Endangered Habitats*).)

Courts recognize that "no project could completely satisfy every policy stated in" a general plan.  (*Sequoyah Hills Homeowners Assn. v. City of Oakland* (1993) 23 Cal.App.4th 704, 719.)  Therefore consistency does not require a project to be in perfect conformity with every general plan policy; instead, the plan must be " 'compatible with the objectives, policies, general land uses, and programs specified in' " the general plan.  (*Id.* at pp. 717-718 [quoting § 66473.5, which addresses the requirement that a proposed subdivision be consistent with a general plan].)  In other words, a project must "be ' "in agreement or harmony with" ' the terms of the applicable plan, not in rigid conformity with every detail thereof." (*San Franciscans Upholding the Downtown Plan v. City and County of San Francisco* (2002) 102 Cal.App.4th 656, 678.)

19

A decision regarding consistency with a general plan is "reviewed by ordinary mandamus, and the inquiry is whether the decision is arbitrary, capricious, entirely lacking in evidentiary support, unlawful, or procedurally unfair." (*Endangered Habitats*, *supra*, 131 Cal.App.4th at p. 782.) "[W]e defer to an agency's factual finding of consistency unless no reasonable person could have reached the same conclusion on the evidence before it." (*Ibid.*)

We review the City's actions, not the trial court's conclusions, and we are "highly deferential" to the City's interpretation of its own General Plan. (*Lagoon Valley*, *supra*, 154 Cal.App.4th at p. 816.) As the party challenging a determination of general plan consistency, the Committee has the burden to show that the determination was unreasonable. (*Pfeiffer v. City of Sunnyvale City Council* (2011) 200 Cal.App.4th 1552, 1563.)

2.  *Analysis*

As an initial matter, we note that in approving the Agreement, the City Council did not make an explicit finding of consistency with the General Plan. The Committee suggests that such a finding was required in this case, but cites no authority for the proposition.[7]  In any event, the City made an implicit finding of consistency, as reflected in the fact that the City, after receiving a comment from the Committee contending that "[p]roviding treated water from the City of Fairfield's system is clearly a basic municipal service" and as a result the proposed agreement was inconsistent with General Plan Policy LU 3.1 (which refers to "urban development requiring

---

[7] The Committee asserts that *"B" Street* stands for the proposition that the Legislature has required general plan consistency findings for all decisions involving the future growth of the state. The cited portion of the case does not support the Committee's assertion.

basic municipal services"), explicitly found in the recitals to the Agreement that the "treat-and-wheel" service that was the subject of the Agreement "does not constitute a basic service (i.e. [the District] is providing the basic services pertaining to distribution, billing, maintenance and repairs)."

      a.    *Policy LU 3.1*

As we have described, Policy LU 3.1 provides, "What is urban shall be municipal, and what is rural shall be within the County. Any urban development requiring basic municipal services shall occur only within the incorporated City and within the urban limit line established by the General Plan." In challenging the City's determination of consistency, the Committee focuses on the second of the two sentences that constitute the policy.

Beyond the fact that the General Plan contains no definition for "urban development" or "basic municipal services," the meaning of Policy LU 3.1 is far from clear, as shown in the parties' different interpretations of the language.

The City asserts that the policy applies to the City's approval of new proposed developments by placing limits on the City's authority to approve urban development that requires "basic municipal services." According to the City, the policy means that before the City may approve proposed urban development located beyond the urban limit line, the City must expand the urban limit line to accommodate the new development, which is not the situation here: the only issue in this case is the approval of a water treatment agreement. The City argues that the policy places limits on urban development proposed for City approval, not on municipal services themselves and in any event not on the mere treatment of water which, according to the City, is not a "basic municipal service," in contrast to the water-related services to be provided to the Project by the District, which

21

include distributing the water, operating and maintaining the distribution system, and billing customers. Thus, the City concludes, it appropriately determined that its approval of the Agreement is consistent with Policy LU 3.1. As we shall explain, the Committee fails to show that the City's determination was unreasonable.

The Committee asserts that Policy LU 3.1 can be interpreted only to mean that the City may not provide basic municipal services to new urban development outside the urban limit line. The Committee also asserts that treating water is a basic municipal service and that the Project is "urban development." Thus, the Committee concludes, the General Plan applies to, and prohibits the Agreement.

For its interpretation of Policy LU 3.1 the Committee relies heavily on unpublished rulings by the Solano County Superior Court in two cases challenging the environmental impact reports for County projects that, among other things, involved the purchase of water or water treatment services from the City.[8] The City was not a party to either case. In both cases, the superior court concluded that the challenged environmental impact reports were deficient for failing to adequately address issues concerning the availability of water for the projects in question. In reaching its conclusion in the first case, *Upper Green Valley*, the superior court stated in 2012 that the General Plan placed a "clear restriction against providing basic municipal

---

[8] The cases are *Upper Green Valley Homeowners Association v. County of Solano* (*Upper Green Valley*), Solano County Sup. Ct. No. FCS03446, and *Solano County Orderly Growth Committee v. Solano County* (*Woodcreek Homes*), Solano County Sup. Ct. No. FCS046724, consolidated with FCS046739 & FCS046752). The unpublished rulings were included in the joint documents provided by the parties to the trial court in connection with the Committee's motion for judgment on the writ petition, and are part of the record on appeal.

services beyond city boundaries," and identified "directly or even indirectly" supplying water as basic municipal services; in the second case, *Woodcreek Homes*, the superior court stated in 2017 that the City's "treating and/or supplying water" was the provision of basic municipal services. These unpublished superior court rulings include no analysis of General Plan Policy LU 3.1 and no analysis as to why the treatment of water constitutes a basic municipal service; they are not binding on us in any event; and we do not find them persuasive.

In arguing that the City unreasonably determined that water treatment is not a basic municipal service, the Committee observes that the Government Code defines "[m]unicipal services" to include "utility services" (§ 54980, subd. (c)) and then argues that cases decided by our Supreme Court recognize that "water supply" is a "paradigmatic 'public utilit[y]' " and that "water treatment and supply is a core 'municipal service.' " The cases on which the Committee relies do not help it. *National City v. Fritz* (1949) 33 Cal.2d 635, 637, recognizes that public utilities include cities "supply[ing] their inhabitants with light, water, power . . ." and *Perez v. City of San Bruno* (1980) 27 Cal.3d 875, 881-882, recognizes that providing water service to residential or business premises is a municipal service. But neither case says anything about the mere treatment of water: the cases concern the type of services that under the Agreement here would be provided by the *District*, including distribution and billing. In short, a reasonable person could conclude that in treating raw water supplied by the District for the District then to provide to its own customers, the City is not providing a "basic municipal service." The Committee has not met its burden to show otherwise.

Even if the Committee had met its burden to show that the City was unreasonable in determining that the services provided under the Agreement are not "basic municipal services," that would not suffice to show that the City unreasonably determined that the approval of the Agreement was consistent with Policy LU 3.1, because that policy concerns the provision of such service to "urban development." The Committee contends that in the context of the General Plan "urban development" refers to "new residential, commercial, or industrial land uses that are not compatible with agriculture or open space." Assuming that definition, the City could nevertheless reasonably have determined that the Project is not "urban development." The description of the Project on which the Committee relies shows that the Project is part of a specific plan, approved by the County, that provides for "clustered development on 257 acres" (that is, the mixed-use development at issue) while preserving the majority of the land in Middle Green Valley, 1,490 acres, for agriculture and open space. Although 123 acres of agricultural land would be converted to non-agricultural uses, more than "577 acres of prime farmland, 50 acres of unique farmland and over 1,200 acres of non-prime farmland and natural open space will be permanently protected." Further, the preserved prime farmland is much greater than the amount of land currently used for agriculture, because only about 200 acres are currently under cultivation. Thus, a reasonable person could conclude that the Project is compatible with agriculture and open space, and therefore does not constitute urban development even under the Committee's own proposed definition.

b.    *Other Policies in the General Plan*

In its petition for writ of mandate in the trial court, the Committee alleged the City's approval of the Agreement is inconsistent with the

language in Policy LU 3.1 that refers to basic municipal services. In briefing before the trial court and on appeal, the Committee argues that the City failed to consider other applicable language in the General Plan, specifically the language in Policy LU 3.1 that "What is urban shall be municipal and what is rural shall be within the County"; the language in Policy LU 2.1 stating that the City's policy is to "[e]ncourage the preservation of agricultural land surrounding the City"; and Policy LU 1.1, which states that the City's policy is to "[o]nly allow development that is consistent with the Land Use Diagram and the Land Use Category designations." As to the last of these, the Committee asserts that most of the Project site has been designated for agricultural use.

As we understand it, the City's position is that the "what is urban shall be municipal . . ." language and Policy LU 2.1 are advisory, not "fundamental, mandatory, and clear" (*Endangered Habitats*, *supra*, 131 Cal.App.4th at p. 782) and therefore the City was not required to determine that the Agreement is consistent with them. The City also asserts that in invoking Policy LU 1.1, the Committee seeks to expand the scope of Policy LU 3.1, which places limits on new urban development that is proposed for City approval, to include any decision that in any way "facilitates" development.

The Committee fails to show that the City was required to determine that its decision to approve the Agreement was consistent with these policies. First, the Committee fails to show that the language in Policy LU 3.1 stating, "What is urban shall be municipal and what is rural shall be within the County," is fundamental, mandatory, and clear. Although the language, like the rest of the text of Policy LU 3.1, is repeated in two other policies in the General Plan, which suggests it is fundamental, and although it includes the word "shall," which can indicate that a provision is mandatory, the provision

25

is far from clear. Indeed, we do not know exactly what it means, and the Committee offers no interpretation. Therefore, the Committee does not demonstrate that the City was required to determine that its decision to approve the Agreement is consistent with that language.

Likewise the Committee fails to show that Policy LU 2.1, to "encourage" the preservation of agricultural land is fundamental, mandatory, and clear. Because the Open Space Element and Agriculture Element of the General Plan include an objective with similar language, "Support preservation of existing agricultural lands," it appears that the policy is fundamental. Even if the General Plan mandated, rather than advised, "encourag[ing]" or "support[ing]" the preservation of agricultural land, the words "encourage" and "support" are vague, rather than clear. As before, the Committee has not demonstrated that the City's decision to approve the Agreement had to be consistent with this language, nor that the City was required to consider that language in making its decision. Regardless, the City could reasonably have concluded that its approval of the Agreement is consistent with Policy LU 2.1 because the development that the Agreement will facilitate is part of a specific plan that, as described in the record, preserves agricultural land near the City's boundaries.

Finally, the Committee fails to show that Policy LU 1.1, which by its terms addresses the City's decisions to "allow" development, applies to a decision that will simply facilitate a development project on County land that the County has approved.

In sum, assuming that California law requires the City's approval of the Agreement to be consistent with the General Plan, we conclude that the City reasonably determined that the approval was consistent with its

26

General Plan.  We need not reach the constitutional issues addressed in the parties' briefs.

## DISPOSITION

The judgment is reversed.  Appellants shall recover costs on appeal, if any.

_____
Miller, J.


WE CONCUR:


_____
Richman, Acting P. J.


_____
Desautels, J.


A170680, A170739, *Solano County Orderly Growth Committee v. City of Fairfield, County of Solano*

Trial Court:  Superior Court of Solano County

Trial Judge:  Hon. Christine A. Carringer

Richards, Watson & Gershon, T. Peter Pierce, Henry M. York, for Defendant and Appellant, City of Fairfield

James W. Laughlin, Deputy County Counsel; Bernadette Curry, County Counsel; Carrie Blacklock, Assistant County Counsel, for Real Party in Interest and Appellant, County of Solano

Shute, Mihaly & Weinberger, Robert S. Perlmutter, Ryan K. Gallagher, for Plaintiff and Respondent

A170680, A170739, *Solano County Orderly Growth Committee v. City of Fairfield, County of Solano*